## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CAREER AGENTS NETWORK, INC.,

       Plaintiff,

v.                             Case No. 09-CV-12269-DT

careeragentsnetwork.biz,
careeragentnetwork.biz,
LAWRENCE R. WHITE, and
AEROMEDIA MARKETING, INC.,

       Defendants.

_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the court are cross-motions for summary judgment. Having reviewed the briefs, the court concludes a hearing is unnecessary. *See* E.D. Mich. LR 7.1(e)(2).

Plaintiff, having recently established itself a promoter and organizer, of sorts, of recruiting entities, acquired the assets of an existing recruiting entity with which Defendant White had earlier engaged in a business relationship. White found himself dissatisfied with the relationship and the business practices of the entity, now affiliated with Plaintiff, and proceeded to establish and maintain websites the domain names of which incorporated Plaintiff's name but which did no more than showcase criticism –attempting, in essence, only to poison Plaintiff's well. There is no evidence that Defendants used these "gripe" websites for commercial gain to themselves, and the statutes under which Plaintiff proceeds, given the facts presented here, do not prohibit

the speech involved in the websites' existence.  For these reasons, as explained below, the court will grant Defendants' motion and deny Plaintiff's motion.

## I.  BACKGROUND[1]

Plaintiff Career Agents Network ("CAN") was formed in late 2008, on or around December 9, 2008.  (Pl.'s Resp. at 3; Defs.' Ex. A.)  CAN applied for registration of its alleged trademark "CAREER AGENTS NETWORK" shortly thereafter on February 9, 2009.  (Am. Compl. ¶ 10.)  In Plaintiff's response brief, Plaintiff explains that CAN is "an international consortium of independently owned recruiting companies from an assortment of high-growth industries.  CAN provides support for recruiting entrepreneurs.  The Member recruiting companies collaborate with one another to place candidates in the right positions.  CAN agents share recruitment fees when they collaborate to place a client."  (Pl.'s Resp. at 3 (citing Byndas Dep. at 1-16, 40, Pl.'s Ex. 3).)

After CAN was formed, it purchased the assets of a Missouri company called Health Career Agents, Inc. ("HCA").  (*Id.*)  According to Plaintiff, "HCA is also a consortium of agents."  (*Id.*)

About a year earlier, in January 2008, Defendant Lawrence White executed a Purchase Agreement with HCA.  Pursuant to the agreement, Defendant White states that he "purchased a business opportunity to be an 'owner/operator' of his own personnel recruiting business."  (Defs.' Mot. Br. at 2.)  "This so-called 'business in a box' would include training, software and support services and access to a network of other

---

[1] The parties agree that the material facts of this case are undisputed.

owner/operators and development as well as training to twenty (20) other consultants

who the owner/operator (Defendant White) may hire." (*Id.* at 2-3.) Defendant White

paid $49,000 to HCA for this business opportunity. (*Id.* at 3.) Defendant White avers

that he "soon discovered that the 'business opportunity' was not as lucrative as

represented." (White Aff. at ¶ 6, Defs.' Ex. B.) He also learned, in late 2008, that HCA

would be "transitioning" its assets to CAN. (*Id.* ¶ 7.)

Plaintiff contends that after CAN purchased the assets of HCA, "agents who were

already under contract with HCA were given the option of contracting with CAN." (Pl.'s

Resp. at 3.) Plaintiff further contends that, despite Defendant White's assertion that he

has no connection with CAN, "[i]f White makes an employee placement with the aid of

HCA, he must split the placement fee with HCA, whose assets are now owned by CAN."

(*Id.* (citing Byndas Dep. at 40, 143, Pl.'s Ex. 3).)

Defendant White is the majority stockholder of Defendant AeroMedia Marketing,

Inc. ("AeroMedia"). (White Aff. ¶ 2, Defs.' Ex. B.) Defendant White, as an agent for

AeroMedia, registered the two domain names at issue in this litigation:

careeragentsnetwork.biz and careeragentnetwork.biz (the "Domain Names"). (*Id.* ¶ 3.)

The two Domain Names were registered on January 21, 2009 and January 22, 2009

with DIRECTI, a commercial registrar of domain names. (*Id.* ¶ 12.)

In their motion for summary judgment, Defendants assert that when AeroMedia

registered the Domain Names with DIRECTI, "AeroMedia opted for the free service of

Privacy Protect. Privacy Protect is a commonly used service that keeps the names of

the registrant of the domain names from direct public access to limit the amount of

spam, junk mail, and unsolicited contact."[2]  (Defs.' Br. at 3.)  "Under Privacy Protect, if a

third party seeks to discover the identity of the registrant, the registrant is provided the

relevant contact information from Privacy Protect."  (*Id.* at 3-4.)  "[H]owever, there is no

direct contact provided to the person seeking the registrant's identity."  (*Id.* at 4.)

After registering the names, Defendant AeroMedia established website hosting

accounts with hosting providers.  (White Aff. ¶ 13, Defs.' Ex. B)   Defendant AeroMedia

was then able to upload its hypertext markup language (html) files for publication and

viewing on the Internet.  (*Id.* ¶ 14.)  The websites[3] consisted of a single page of text,

which stated in its entirety:

> WARNING
> If you are considering investing in
> this "opportunity", be aware that it is
> highly improbable that you will earn
> enough to cover your investment.  If
> you proceed with this company you
> have been warned by those that
> know and have lost $20,000-$150,000
> by trusting them and their "plan"

(*Id.* ¶ 15; Defs.' Ex. E.)  After posting the website, Defendants employed a search

engine optimizer ("SEO") to assist in raising the website presence in search engines

---

[2]For support of this proposition, Defendants cite to pages 19-20 of Defendant
White's deposition.  (Defs.' Br. at 3, n.4 & 5.)  However, these pages were not included
in the submission provided to the court.  Nonetheless, it does not appear to be
contested that Defendants signed up for privacy protection when establishing their
websites.

[3]In their briefs and accompanying exhibits, the parties refer to Defendants'
"website" (singular) or "websites" (plural) interchangeably and apparently without
distinction.  For the sake of consistency, the court will refer to Defendants' websites
(plural), although whether Defendants established one or two websites does not affect
the analysis in this opinion.

such as Google, Yahoo, MSN, and other search tools.  (White Aff. ¶ 17, Defs.' Ex. B)
The effect of utilizing the SEO is that when a search term was entered with the string of
keywords, "career agents," "career agents network," or other similar words, Defendants'
website would be listed among the top search results.  (*Id.*)

   According to Defendant White, at the time Defendant registered the Domain
Names, "Plaintiff had no substantive online presence.  A Domain Name
'www.careeragentsnetwork.com' existed but, [sic] the website consisted of only the
words 'Career Agents Network' in black type on a white background and contained no
links and no information."  (*Id.* ¶ 19).

   Defendant avers that "[t]he sole intent in creating the websites was to express an
opinion about the business practices of Plaintiff."  (White Aff. ¶ 21, Defs.' Ex. B)
Defendant also contends that neither he nor AeroMedia ever attempted or offered to sell
the Domain Names to Plaintiff or anyone else.  (*Id.* ¶¶ 20, 22.)  Defendant White states
that at no time did he make or seek to make a profit as a result of the operation of the
websites, nor is he aware of any customers that have confused the websites with that of
Plaintiff.  (*Id.* ¶¶ 20, 23.)

   Plaintiff asserts that "[t]hough CAN is a relatively new company, it has spent
hundreds of thousands of dollars marketing and advertising of the CAN Mark, and
announced the asset purchase agreement with HCA publicly."  (Pl.'s Resp. at 4.)
Joshua Decker, the manager of marketing services at CAN, avers that "[t]he annual
budget for marketing and advertising at CAN is more than $100,000."  (Decker Decl. ¶
3.)  Decker also asserts that "CAN uses the Internet extensively for advertising and
marketing."  (*Id.*)

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial.  *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing' –that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter,* 369 F.3d 906, 909 (2004) (citing *Celotex*, 477 U.S. at 325).  The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial."  *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587 (1986)).  Summary judgment is not

appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

## III.  DISCUSSION

Plaintiff's First Amended Complaint asserts two counts against Defendants: cybersquatting under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA") and trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a).

### A.  Cybersquatting

The ACPA provides, in relevant part:

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark . . . and

(ii) registers, traffics in, or uses a domain name that--

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . .

15 U.S.C. § 1125(d)(1)(A).

In order to establish a "cybersquatting" claim under the ACPA, Plaintiff must establish: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) Defendants' Domain Names are identical or confusingly similar to, or in the case of famous marks, dilutive of, Plaintiff's mark; and (4) Defendants used, registered,

7

or trafficked in the domain name (5) with a bad faith intent to profit.  *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004) (citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003)).  Here, Plaintiff's case must fail because it has provided no evidence that Defendants used the Domain Names with a bad faith intent to profit.

The ACPA lists several factors a court may consider in determining whether a person has a bad faith intent, including:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of

8

others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B).  Courts "are not limited to considering just the listed factors when making [the] determination of whether the statutory criterion has been met.  The factors are, instead, expressly described as indicia that 'may' be considered along with other facts."  *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2000) (citing 15 U.S.C. § 1125(d)(1)(B)(i)).   "The role of the reviewing court is not simply to add factors and place them in particular categories, without making some sense of what motivates the conduct at issue. The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit."  *Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F.3d 806, 811 (6th Cir. 2004).

In *Lucas Nursery*, the defendant, who was dissatisfied with the services provided by the plaintiff's landscaping business, registered the domain name "lucasnursery.com" to complain about the plaintiff's company.  The Sixth Circuit balanced the relevant "bad faith intent" factors listed above and found:

None of these factors militates against Grosse.  There is no dispute that Lucas Nursery did not have an online location, and hence Grosse's creation of a web site to complain about Lucas Nursery's services could not have been intended "to divert consumers from the mark owners's online location."  Nor is there any evidence that Grosse ever sought to mislead consumers with regard to the site's sponsorship.  The web site explicitly stated that the site was established by Grosse for the purposes of relaying her experience with Lucas Nursery.  Moreover, Grosse never

9

offered to sell the site to Lucas Nursery.  She also did not provide
misleading contact information when she registered the domain name.
Finally, she has not acquired any additional domain names, which would
be indicative of either an intent to sell such names to those entities whose
trademarks were identical or similar, or exploit them for other uses.

*Id.* at 810.  A similar balancing in this case results in the same conclusion.  Specifically,

the court finds that as in *Lucas Nursery*, no reasonable jury could find a "bad faith intent

to profit" under the circumstances of this case.  It is undisputed that Defendants set up

websites using Plaintiff's alleged mark, that Defendants had never previously used the

mark, and that Defendants themselves had no intellectual property rights in the "Career

Agents Network" mark.  Defendants specifically admit that they set up the sites in order

to refer to Plaintiff's business, and to negatively comment on CAN.  However, it is also

undisputed that Defendants never attempted to sell the Domain Names to Plaintiff and

that Defendants have not registered or attempted to sell other domain names

incorporating other alleged marks.[4]  Further, contrary to Plaintiff's argument, there is no

evidence that Defendants provided "false or misleading" contact information in

registering the Domain Names.  The record indicates that Defendants provided *accurate*

contact information, but that they utilized a privacy protection service so as to not make

their contact information readily available to the general public.  Use of the privacy

protection service is not the same thing as providing false or misleading contact

information.  Nor is there any evidence that Defendants created a "a likelihood of

confusion as to the source, sponsorship, affiliation, or endorsement of the site."  15

---

[4]While Defendants have registered other domain names to criticize organizations,
they do not incorporate trademarks nor have they attempted to sell the domain names.

U.S.C. § 1125(d)(1)(B)(V).  Given the content of the sites, criticizing CAN, there can be no issue of fact that anyone viewing Defendants' sites would believe that CAN had sponsored, created, endorsed or was in any way affiliated with the sites.[5]

The Sixth Circuit has stated that "cybersquatting" under the ACPA occurs when someone "other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *DaimlerChrysler*, 388 F.3d at 204 (citing *Sporty's Farm*, 202 F.3d at 493).  This is not what happened in this case.  Plaintiff attempts to cast this case as one in which Defendants were "caught red-handed attempting to damage Plaintiff's business *and thereby divert clients and bolster [their] own competing business*."  (Pl.'s Resp. Br. at 1 (emphasis added).)  It is true that there is evidence that Defendants attempted to damage Plaintiff's business, but there is no evidence that Defendants attempted to "divert" Plaintiff's clients to bolster their own business.  Instead, the undisputed evidence reveals that Defendants established a "gripe site," in which they expressed their strong dissatisfaction with Plaintiff's "business in a box," or investment opportunity.

---

[5]This is true despite the fact that Defendants' websites did not include a disclaimer indicating that the sites were not sponsored by CAN.  The Sixth Circuit has found the presence of disclaimers as supportive of a finding of no bad faith, *Taubman v. Webfeats*, 319 F.3d 770 (6th Cir. 2003), but this does not necessarily mean that the absence of disclaimers mandates a finding of bad faith.  Further, disclaimers are more important in cases such as *Taubman*, where the content of the website could have created confusion as to the source of the website.  *Id.*  Here, given the highly critical content of the website, no such confusion exists.

Plaintiff argues that Defendant White "is a recruiter in the same business as is CAN" and that he has a commercial interest in "diverting potential customers from CAN [because] he makes more money if CAN agents are not involved in his employee placements." (Pl.'s Resp. Br. at 9.) There are, however, several problems with Plaintiff's argument. First, there is some question as to whether Plaintiff has presented sufficient evidence that the parties are competitors of one another. The parties disagree on this point. Plaintiff asserts that they are both in the employment recruiting business and thus competitors, while Defendants claim that Plaintiff merely sells recruiting businesses, rather than operating them itself.

Charlotte Byndas, the owner of Career Agents Network, testified that she runs a business that "launches people into recruiting firms, and so that's my job now *is to help entrepreneurs start up recruiting businesses*." (Byndas Dep. at 8, Pl.'s Ex. 3 (emphasis added).) Defendant White, however, does not "help entrepreneurs start up recruiting businesses," but instead himself operates such a recruiting business. (White Aff. at ¶ 5, Defs.' Ex. B.) Thus, while the parties are generally in the same field of the "recruiting industry," conceptually they operate at different levels. Indeed, it can even be argued they operate in different fields, because Defendant White and HCA deal solely with the placement of health care professionals, whereas CAN deals with other professions beyond the health care industry. (Byndas Dep. at 13-14.)

To the extent that Defendant White, in operating his placement business competes with the member companies of CAN, Byndas testified that, anytime that White makes a placement through use of HCA's member network (which is how HCA and CAN are designed to operate) White owes a fee to HCA which in turn is paid to

12

CAN because it owns the assets of HCA. (Byndas dep. at 40.) Thus, to some extent, Defendants' success benefits, not harms, Plaintiff. (*Id.* at 40.)

Byndas herself testified that CAN has no competitors, and that no other recruiting firms offers services the same way CAN does. (Byndas Dep. at 44-45, Defs.' Ex. H.) She testified that the closest thing to a competitor would be a franchise organization, rather than an organization, like CAN, which offers a "business-in-a-box." (*Id.* at 45.)

When asked at her deposition how Defendants could be competing with Plaintiff when Plaintiff does not have "any competition," Byndas offered that people "looking at entering into the recruiting space" have multiple options. (*Id.*) "They can purchase a franchise, they could purchase a membership with us and we could help them launch that business, or they could join an ongoing entity." (*Id.*) The court is not persuaded that a business offering an opportunity to own a franchise is in competition with a franchise. The services offered are different, and draw interest from different clients.

Further, even if the court accepted Plaintiff's theory of competition, it has not offered any evidence to suggest that Defendant White was competing or attempting to divert customers away from Plaintiff. Byndas testified that her "feeling" is that Defendant's firm wanted to recruit people to join HCA, rather than have them join CAN. (Byndas Dep. at 39.) She bases this "feeling" on her belief that Defendant's firm recruited a large number of people. (*Id.*) And she bases this belief on correspondence she received from White that states "Charlotte: Over the past fifteen months I've had to terminate or had quit more than fifty consultants that are unable to earn a living, so I can understand your disappointment in letting two go." (*Id.* at 39-40.) Byndas testified that, based on this correspondence, she deduced that "what he gained from [registering the

13

Domain Names and posting his websites] was that he wanted to encourage people to join his firm rather than joining as owner/operators of [CAN]." (*Id.* at 40.) Plaintiff's suppositions about Defendants' intent are not evidence that Defendants were actually trying to divert potential owners/operators away from CAN. The "fact" provided by Defendant White, in what appears to be a sarcastic tone, that he had to let go fifty consultants, does not support Plaintiff's "belief" that these consultants were individuals who Defendant White lured away from Plaintiff at all, let alone through use of the Domain Names. There is no evidence as to when these consultants were first hired by Defendant, no evidence as to whether these are consultants who initially were interested in joining CAN as an owner/operator or in any other capacity, no evidence that these consultants knew about or saw Defendant's website, and no evidence as to how they might have then stumbled upon Defendant's company even if they had seen Defendant's website. Nor is there any evidence, other than Plaintiff's mere conjecture, that Defendants intended to divert these consultants away from Plaintiff.

Indeed, the court cannot imagine how Defendants may have intended to profit from their use of Plaintiff's alleged marks in their Domain Names. There were no links or contact information posted on the websites which would "divert" customers from Plaintiff to Defendants. Any viewer of Defendants' websiteswould have no way of knowing even of the option of joining Defendants' business. Plaintiff has not presented any evidence that there were only two options available to its potential customers and, by disparaging Plaintiff's business as one option, customers were *necessarily* diverted to the only remaining option of joining Defendants' company. Plaintiff's "belief" that Defendant was trying to divert customers by criticizing Plaintiff is simply too attenuated

14

to be more than, at most, a scintilla of evidence in support of its position, and is certainly not enough to withstand Defendants' summary judgment motion.

Fundamentally, Plaintiff seems to argue that because the facts show that Defendants attempted to harm Plaintiff, Plaintiff can show a bad faith intent to profit. For example, it is irrelevant to the bad faith inquiry that Defendants utilized an SEO to increase the number of "hits" on its website. As stated above, Plaintiff must show more than Defendants' attempt to harm Plaintiff's business. Plaintiff must show that Defendants had a bad faith intent to profit from their use of the Domain Names.[6] *DaimlerChrysler*, 388 F.3d at 204. Toward that end, as stated above, the court agrees with Defendants that this case is controlled by the Sixth Circuit's decision in *Lucas Nursery,* 359 F.3d 806. Indeed, the Sixth Circuit's observation in *Lucas Nursery* is equally appropriate in this case:

> Perhaps most important to our conclusion are, [the defendant's] actions, which seem to have been undertaken in the spirit of informing fellow consumers about the practices of a landscaping company that she believed had performed inferior work on her yard. One of the ACPA's main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands. The

_____

[6]This is not the same inquiry as finding a "commercial use" by Defendants. There, are perhaps, situations in which a defendant could make a "noncommercial use" of a mark with a bad faith intent to profit. For example, in *Bosley Medical Institute, Inc. v. Kremer,* 403 F.3d 672 (9th Cir. 2005), the Ninth Circuit held that, unlike a trademark infringement claim, an ACPA cybersquatting claim was not subject to a commercial use requirement. The court nonetheless held that the plaintiff must show a bad faith intent to profit. *Id.* at 681. The Ninth Circuit remanded to the district court to allow discovery on whether the defendant registered the domain names in bad faith and, specifically, whether he had sent letters to the plaintiff offering to sell the domain name. Thus, this court's inquiry, focused on whether Plaintiff can show Defendants had a bad faith intent to profit is not the same inquiry as whether they may have made a commercial use of the mark.

practice of informing fellow consumers of one's experience with a
particular service provider is surely not inconsistent with this ideal.

*Id.* at 811.  Similarly, Defendants' use of Plaintiff's alleged mark in the Domain Names

registered to criticize Plaintiff's business is not "inconsistent with," nor in violation of, the

ACPA.  Plaintiff cannot show that Defendants had a bad faith intent to profit, and

summary judgment will thus be granted to Defendants on this count.

### B.  Trademark Infringement

Plaintiff's complaint also asserts a cause of action for trademark infringement

under the Lanham Act.  The Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or
> any container for goods, uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any false designation of
> origin, false or misleading description of fact, or false or misleading
> representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to
> > deceive as to the affiliation, connection, or association of
> > such person with another person, or as to the origin,
> > sponsorship, or approval of his or her goods, services, or
> > commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents
> > the nature, characteristics, qualities, or geographic origin of
> > his or her or another person's goods, services, or
> > commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is
> or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

"The Lanham Act is constitutional because it only regulates commercial speech,

which is entitled to reduced protections under the First Amendment."  *Taubman Co. v.*

*Webfeats,* 319 F.3d 770, 774 (6th Cir. 2003) (citing *Central Hudson Gas & Elec. Corp.*

16

*v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980)).  The Sixth Circuit has

therefore held that the first inquiry under the Lanham Act is whether the defendant's

"use is commercial and therefore within the jurisdiction of the Lanham Act, worthy of

lesser First Amendment protections."  *Id.*   If the defendant's use "is commercial, then,

and only then, do we analyze his use for a likelihood of confusion.  If [the defendant's]

use is also confusing, then it is misleading commercial speech, and outside the First

Amendment."  *Id.* at 774-75.  "Hence, as per the language of the Lanham Act, any

expression embodying the use of a mark not 'in connection with the sale . . . or

advertising of any goods or services,' and not likely to cause confusion, is outside the

jurisdiction of the Lanham Act and necessarily protected by the First Amendment."

*Id.* at 775; *see also Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 676-77 (9th

Cir. 2005) ("The Supreme Court has made it clear that trademark infringement law

prevents only unauthorized uses of a trademark in connection with a commercial

transaction in which the trademark is being used to confuse potential consumers.").

Thus, the court first focuses on whether Defendants' use of the Domain Names

was a "commercial use."  Despite the court's conclusion that Defendants' use was

undisputedly not commercial, the court will also briefly address whether Defendants'

use is likely to cause confusion.

### 1.  Whether Defendants' Use of the Domain Names Constitute Noncommercial Speech Protected by the First Amendment

Plaintiff argues that Defendants' registration and use of the Domain Names

constituted commercial use because Defendant White operates an employment

recruiting company which is in competition with Plaintiff's business.  Thus, Plaintiff

intimates that Defendants' attempt to disparage Plaintiff's business was necessarily a commercial use because it harmed Plaintiff's business.  As the court is unconvinced that Plaintiff's theory evinces Defendants' "bad faith intent to profit," so the court is also unconvinced that Plaintiff's theory evinces a commercial use.  First, as discussed above, the court is not persuaded that Plaintiff has presented sufficient evidence that it is a competitor of Defendants.  While they operate in the same general recruiting industry, they do so in different ways and aim at different types of customers.  Further, even if the parties are competitors, Defendants' actions in posting a critical commentary of Plaintiff's business is not a "commercial use" under the facts of this case.

In so holding, the court finds persuasive the reasoning set forth by the Ninth Circuit in *Bosley*, 403 F.3d 672.  In *Bosley*, the facts were similar to the facts of this case.  As summarized by the Ninth Circuit:

> Defendant Michael Kremer was dissatisfied with the hair restoration services provided to him by the Bosley Medical Institute, Inc. In a bald-faced effort to get even, Kremer started a website at www.BosleyMedical.com, which, to put it mildly, was uncomplimentary of the Bosley Medical Institute.  The problem is that "Bosley Medical" is the registered trademark of the Bosley Medical Institute, Inc., which brought suit against Kremer for trademark infringement and like claims.  Kremer argues that noncommercial use of the mark is not actionable as infringement under the Lanham Act.  Bosley responds that Kremer is splitting hairs.

*Id.* at 674. The court held that "the noncommercial use of a trademark as the domain name of a website-the subject of which is consumer commentary about the products and services represented by the mark-does not constitute infringement under the Lanham Act."  *Id.*  In concluding that the defendant's use was noncommercial, the court found relevant that the defendant's site did not contain any commercial links but rather

contained links to a discussion group, which in turn contained advertising.  *Id.* at 678.
The court stated that "[t]his roundabout path to the advertising of others is too
attenuated to render Kremer's site commercial.  At no time did Kremer's
BosleyMedical.com site offer for sale any product or service or contain paid
advertisements from any other commercial entity."  *Id.*

Likewise, the court rejects Plaintiff's theory that solely because Defendants are
competitors then their use of the Domain Names is commercial.  As more fully
discussed above, it strains credulity that Defendants set up these Domain Names as a
means of generating business.  The websites did not contain links to Defendants'
website, or even mention Defendants' business as an alternative to Plaintiff.  Under
Plaintiff's theory, the court would have to accept that it is a viable commercial use of
Plaintiff's Domain Names for Defendants to criticize Plainitff in the hopes that the
Internet surfer would then somehow fortuitously find his way to Defendants' website,
which offers a different service than does Plaintiff's company, and decide to use
Defendants' service instead.  This "roundabout path" is extremely unlikely and does not
support a finding of commercial use.

Moreover, that Defendants were attempting to harm Plaintiff's business is not
sufficient to translate criticism into commercial use.  The Ninth Circuit rejected a similar
argument as "over-expansive", finding that it would "place most critical, otherwise
protected consumer commentary under the restrictions of the Lanham Act," and "would
encompass almost all uses of a registered trademark, even when the mark is merely
being used to identify the object of consumer criticism."  *Id.* at 679.

> This broad view of the Lanham Act is supported by neither the text of the statute nor the history of trademark laws in this country. "[T]rademark laws are intended to protect" consumers from purchasing the products of an infringer "under the mistaken assumption that they are buying a product produced or sponsored by [the trademark holder]." *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 450 (S.D.N.Y. 1982). Limiting the Lanham Act to cases where a defendant is trying to profit from a plaintiff's trademark is consistent with the Supreme Court's view that "[a trademark's] function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his." *United Drug Co. v. Theodore Rectanus Co., 248 U*.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *see also* 1 McCarthy on Trademarks and Unfair Competition § 2:7 (4th ed. 2004).

*Id.* Merely because Defendants' use of the Plaintiff's alleged mark excoriated certain commercial practices does not mean that Defendants' use of the Domain Names was in turn "commercial." Defendants did not use the alleged mark in any connection whatsoever with their own business or website, nor did they attempt to sell or advertise anything at all in connection with the Domain Names.

The court also rejects Plaintiff's argument that Defendants' use of the Domain Names necessarily constitutes a trademark violation because the Domain Names are verbatim recitations of Plaintiff's alleged mark. Plaintiff cites district court cases from other circuits for his proposition, which are not only non-binding, but distinguishable. For example, Plaintiff cites to *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 186 (W.D.N.Y. 2000), which held that "the national, and even international, nature of the Internet itself makes defendants' use of plaintiffs' trademark as a domain name a use in commerce' for purposes of the Lanham Act." The court disagrees with this non-binding holding, but also notes that *OBH* is distinguishable because the defendant's website in *OBH* contained links to the defendant's on-line business which was operated for a commercial purpose. *Id.*

Plaintiff also cites to *Jews for Jesus v. Brodsky,* 993 F. Supp. 282, 308 (D.N.J.

1998), where the court found commercial use, in part because:

> the Defendant has done more than merely register a domain name. He
> has created, in his words, a "bogus 'Jews for Jesus' " site intended to
> intercept, through the use of deceit and trickery, the audience sought by
> the Plaintiff Organization.  Moreover, the Defendant Internet site uses the
> Mark and the Name of the Plaintiff Organization as its address, conveying
> the impression to Internet users that the Plaintiff Organization is the
> sponsor of the Defendant Internet site.

*Id.* (footnote omitted).  In *Jews for Jesus*, however, the challenged website also

contained a hyperlink to a commercial website.  *Id.*

Plaintiff also relies on *Jews for Jesus*, for the proposition that

> The conduct of the Defendant also constitutes a commercial use of the
> Mark and the Name of the Plaintiff Organization because it is designed to
> harm the Plaintiff Organization commercially by disparaging it and
> preventing the Plaintiff Organization from exploiting the Mark and the
> Name of the Plaintiff Organization. *See Panavision*, 945 F.Supp. at 1303.
> In addition, the Defendant Internet site has and will continue to inhibit the
> efforts of Internet users to locate the Plaintiff Organization Internet site.
> *See id.*

*Id.* at 308.  This court, however, rejected the reasoning of *Jews for Jesus* nine years

ago in *Ford Motor Company v. 2600 Enterprises*, 177 F.Supp. 2d 661 (E.D. Mich.

2001)).  In that case, the court held that:

> First, Defendants' use of the FORD mark in their programming code,
> unlike the unauthorized use of a trademark as a domain name, does not
> inhibit Internet users from reaching the websites that are most likely to be
> associated with the mark holder. Second, where, as here, the
> unauthorized use in no way competes with the mark owner's offering of
> goods or services, the "in connection with goods or services" requirement
> is not satisfied simply because a prospective user of the Internet may face
> some difficulty in finding the home page he is seeking.
>
> > [T]rademark law requires reasonableness on the part of
> > consumers. Although the need to search for a mark holder's
> > site may rise to the level of inconvenience, this

21

> inconvenience is not cognizable. An Internet user who
> intends to access either party's products or services, but
> who has not done so before, may go to a search engine, or
> on America Online, to Keyword. Any inconvenience to an
> Internet user searching for Plaintiff's web site is trivial.
> Searches for Plaintiff's web page on popular internet search
> engines, including google.com, goto.com, and lycos.com, list
> Plaintiff's web site as their first or second "hits."

*Id.* at 665-66 (citing *Strick Corp. v. Strickland*, 162 F.Supp. 2d 372, 379-80 (E.D. Pa.

2001) and *Hasbro Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 124-25 (D. Mass.

1999).

Plaintiff points out that in *Ford Motor Company* the court stated the defendant's

use was in a programming code, "unlike the unauthorized use of a trademark as a

domain name." *Id.* at 665. Plaintiff thus extrapolates that because this case involves

the use of a trademark as a domain name then necessarily the reasoning of this court in

*Ford Motor Company* does not apply. Nonetheless, the language on which Plaintiff

relies was dicta and is not determinative to the conclusion in this case. Further, the

language on which Plaintiff relies was only a portion of the first of two alternative bases

on which to reject the reasoning of *Jews for Jesus* and Plaintiff's theory in this case.

Most importantly, however, in the intervening years since *Ford Motor Company* was

decided, the Sixth Circuit has implicitly rejected the theory that the use of a trademark in

a domain name necessarily constitutes trademark infringement.

In *Taubman Co. v. Webfeats,* 319 F.3d 770 (6th Cir. 2003), the Sixth Circuit

found that the use of the website "shopsatwillowbend.com," which was an informational

website with a map of a shopping center and a list of the tenant stores did not infringe

on the registered mark, "The Shops at Willow Bend," so long as it did not contain links

22

or advertisements to other businesses. *Id.* at 775-76. Thus, the fact that the Domain

Names were identical to Plaintiff's alleged mark does not automatically establish

trademark infringement or evince a commercial use of the Domain Names.

> In *Bosley*, the court stated:
>
> The Second Circuit held in *United We Stand America, Inc. v. United We
> Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir.1997), that the
> "use in connection with the sale of goods and services" requirement of the
> Lanham Act does not require any actual sale of goods and services.
> Thus, the appropriate inquiry is whether Kremer offers competing services
> to the public. Kremer is not Bosley's competitor; he is their critic. His use
> of the Bosley mark is not in connection with a sale of goods or services-it
> is in connection with the expression of his opinion about Bosley's goods
> and services.

*Bosley Medical Institute, Inc.,* 403 F.3d at 679. Although Plaintiff argues that

Defendants are its competitors, there is no triable issue that in using the Domain

Names, Defendants were not offering competing services or otherwise using Plaintiff's

mark in connection with the sale of goods or services. As in *Bosley*, they were using

the Domain Names solely in connection with the expression of an opinion. Accordingly,

> [t]he dangers that the Lanham Act was designed to address are simply not
> at issue in this case. The Lanham Act, expressly enacted to be applied in
> commercial contexts, does not prohibit all unauthorized uses of a
> trademark. Kremer's use of the Bosley Medical mark simply cannot
> mislead consumers into buying a competing product-no customer will
> mistakenly purchase a hair replacement service from Kremer under the
> belief that the service is being offered by Bosley. Neither is Kremer
> capitalizing on the good will Bosley has created in its mark. Any harm to
> Bosley arises not from a competitor's sale of a similar product under
> Bosley's mark, but from Kremer's criticism of their services. Bosley
> cannot use the Lanham Act either as a shield from Kremer's criticism, or
> as a sword to shut Kremer up.

*Id.* at 679 -680. The court finds that Plaintiff has failed to proffer sufficient evidence to

create a triable issue as to Defendants' noncommercial use of the Domain Names. As

such, Plaintiff cannot show a violation of the Lanham Act, and Defendants are entitled to

summary judgment.

## 2. Likelihood of Confusion

Further, the court finds that even if Plaintiff could show that Defendants' use of

the Domain Names was commercial, and within the jurisdiction of the Lanham Act,

Defendants are still entitled to summary judgment because Plaintiff cannot show that

Defendants use created a likelihood of confusion among customers.   As the Second

Circuit has held:

> The Lanham Act seeks to prevent consumer confusion that enables a
> seller to pass "off his goods as the goods of another."  *Programmed Tax
> Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1132 (S.D.N.Y.1977)
> (quoting *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F. Supp. 861,
> 863 (S.D.N.Y.1962), aff'd, 312 F.2d 125 (2d Cir. 1963). In *Programmed
> Tax Systems*, the court explained that the relevant confusion is that which
> affects "the purchasing and selling of the goods or services in question."
> *Id.*  The Restatement concurs, citing to Judge Lasker's opinion in
> *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 450
> (S.D.N.Y. 1982), for the proposition that "trademark infringement protects
> only against mistaken purchasing decisions and not against confusion
> generally."  Restatement, supra, § 20 reporter's note at 179.

*Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 582-83 (2d Cir. 1991).

Under the undisputed facts before the court no rational fact-finder could find that

Defendants' use of the Domain Names created the likelihood of confusion between their

products and services and Plaintiff's.  As stated multiple times above, there is no

mention of Defendants' business on the challenged websites.  Nor could any rational

fact-finder find that Defendants attempted to create confusion between the parties'

services, as the subject websites stood alone, *i.e., sans* links, and as such they plainly

accomplished nothing more than to criticize Plaintiff's business practices.  There is no

24

triable issue that Defendants were attempting to pass off their services as Plaintiff's.

The Sixth Circuit has held that "the only important question is whether there is a likelihood of confusion *between the parties' goods or services*."  *Taubman*, 319 F.3d at 776 (emphasis in original) (citing *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir .2002)). Thus, "[u]nder Lanham Act jurisprudence, it is irrelevant whether customers would be confused as to the origin of the websites, unless there is confusion as to the origin of the respective products."  *Id.* (citing *Daddy's Junky Music Stores*, 109 F.3d at 280)). The court further elaborated:

> We find that Mishkoff's use of Taubman's mark in the domain name "taubmansucks.com" is purely an exhibition of Free Speech, and the Lanham Act is not invoked. And although economic damage might be an intended effect of Mishkoff's expression, the First Amendment protects critical commentary when there is no confusion as to source, even when it involves the criticism of a business.  Such use is not subject to scrutiny under the Lanham Act.  In fact, Taubman concedes that Mishkoff is "free to shout 'Taubman Sucks!' from the rooftops . . . ."  Brief for Respondent, at 58.  Essentially, this is what he has done in his domain name.  The rooftops of our past have evolved into the internet domain names of our present.  We find that the domain name is a type of public expression, no different in scope than a billboard or a pulpit, and Mishkoff has a First Amendment right to express his opinion about Taubman, and as long as his speech is not commercially misleading, the Lanham Act cannot be summoned to prevent it.

*Id.* at 778.  Here, as in *Taubman*, Defendants' use of the Domain Names was not commercially misleading.  Plaintiff can therefore not invoke the Lanham Act to protect itself from unwanted critical commentary.  Defendants' motion for summary judgment will be granted.

## IV.  CONCLUSION

IT IS ORDERED that Defendants' motion for summary judgment [Dkt. # 43] is

GRANTED and Plaintiff's motion for summary judgment [Dkt. # 55] is DENIED.  A

separate judgment will issue.


       S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  February 26, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 26, 2010, by electronic and/or ordinary mail.

       S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522


S:\Cleland\JUDGE'S DESK\C3 ORDERS\09-12269.CAREERAGENTS.Trademark.Cybersquatting.2.wpd