UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAREER AGENTS NETWORK, INC., )
)
Plaintiff, )
)
v. )    Case No. 09-CV-12269-DT
)
careeragentsnetwork.biz, )
careeragentnetwork.biz, )
LAWRENCE R. WHITE, and )
AEROMEDIA MARKETING, INC., )
)
Defendants. )

**(CORRECTED) MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR AN AWARD OF ATTORNEY FEES**

Statement of Issues and Principal Supporting Authorities.................................. ii

Table of Authorities......................................................... iii

Facts and Proceedings to Date.................................................. 1

ARGUMENT............................................................... 8

I.      White Should Be Awarded His Attorney Fees Because Career Agents Network
        Brought a Groundless Case to Suppress Critical Speech and Used Abusive Litigation
        Tactics to Oppress a Small Adversary.................................... 8

II.     The Court Should Award $36,324.82 in Attorney Fees and Expenses............... 15

Conclusion................................................................ 17

## STATEMENT OF ISSUES AND PRINCIPAL SUPPORTING AUTHORITIES

1.	Should attorney fees be awarded because plaintiff brought a groundless case to suppress critical speech and used abusive litigation tactics to oppress a small adversary?

   *Taubman v. Webfeats*, 319 F.3d 770 (6th Cir. 2003)
   *Lucas Nursery and Landscaping v. Grosse*, 359 F.3d 806 (6th Cir. 2004)
   *Eagles, Ltd. v. American Eagle Foundation*, 356 F.3d 724 (6th Cir. 2004)
   *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2004)
   *Door Sys. v. Pro-Line Door Sys.,* 126 F.3d 1028 (7th Cir. 1997)

   Defendants answer yes; argument on this issue  begins on page 8.


2.	Should defendants be awarded $36,324.82 in fees and expenses?

   *Imwalle v. Reliance Medical Products*, 515 F.3d 531, 551-552 (6th Cir. 2008)

   Defendants answer yes; argument on this issue begins on page 15.

# TABLE OF AUTHORITIES

**CASES**

*Ale House Management v. Raleigh Ale House,*
    205 F.3d 137 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Balance Dynamics Corp. v. Schmitt Industrial,*
    208 F.3d 212 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Blum v. Stenson,*
    465 U.S. 886 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bosley Medical v. Kremer,*
    403 F.3d 672 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cairns v. Franklin Mint Co.,*
    292 F.3d 1139 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cedar Crest Health Center v. Bowen,*
    129 F.R.D. 519 (S.D. Ind. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*DaimlerChrysler v. The Net Inc.,*
    388 F.3d 201 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Door Systems v. Pro-Line Door Systems,*
    126 F.3d 1028 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Eagles, Ltd. v. American Eagle Foundation,*
    356 F.3d 724 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Finance Investment Co. v. Geberit AG,*
    165 F.3d 526 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fogerty v. Fantasy, Inc.,*
    510 U.S. 517 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Geier v. Sundquist,*
    372 F.3d 784 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gonter v. Hunt Valve Co.,*
    510 F.3d 610 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Imwalle v. Reliance Medical Products,*
515 F.3d 531 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jorgenson v. County of Volusia,*
846 F.2d 1350 (11th Cir.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lamparello v. Falwell,*
420 F.3d 309 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lighthouse Ministry v. Foundation for Apologetic Information and Research,*
527 F.3d 1045 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lucas Nursery and Landscaping v. Grosse,*
359 F.3d 806 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Maine Audubon Social v. Purslow,*
907 F.2d 265 (1st Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mattel, Inc. v. Walking Mountain Productions,*
353 F.3d 792 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McCombs v. Meijer, Inc.,*
395 F.3d 346 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*National Association of Professional Baseball Leagues v. Very Minor Leagues,*
223 F.3d 1143 (10th Cir.  2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Noxell Corp. v. Firehouse No. 1 Barbeque Restaurant,*
771 F.2d 521 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Taubman v. Webfeats,*
319 F.3d 770 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*TMI v. Maxwell,*
368 F.3d 433 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Universal Communication Systems v. Lycos, Inc.,*
478 F.3d 413 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wal-Mart Stores v. Samara Bros.,*
529 U.S. 205 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Weisenberger v. Huecker*,
　　593 F.2d 49 (6th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Woodhaven Homes & Realty v. Hotz*,
　　396 F.3d 822 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Yankee Candle Co. v. Bridgewater Candle Co.*,
　　140 F. Supp. 2d 111 (D. Mass. 2001),
　　*aff'd*, 259 F.3d 25 (1st Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## CONSTITUTION, LEGISLATIVE MATERIALS AND RULES

United States Constitution
　　First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 14

Lanham Act,
　　15 U.S. C. §§ 1051 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

　　Section 35(a), 15 U.S.C. § 1117(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
　　Section 43(c)(2)(A),15 U.S.C. § 1125(c)(2)(A).. . . . . . . . . . . . . . . . . . . . . . . . . 4

S. Rep. No. 93-1400 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7136. . . . . . . . . . . . . . . . . 8

Michigan Rules of Professional Responsibility
　　Rule 3.3(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

This is a classic case of oppressive litigation being used to stifle free speech: a suit in which a company that holds itself out as helping people set themselves up in the recruiting business brought a spurious trademark lawsuit to punish a dissatisfied customer for using its name to identify it as a company that should not be trusted with a substantial investment. It obtained a preliminary injunction from this Court in an ex parte proceeding in which it failed to identify the controlling circuit precedent that precluded its lawsuit, then told the defendant that he should pay $40,000 to cover damages that had been sustained as a result of his public criticism. It pointed to the Court's ruling on the preliminary injunction to show that it was going to prevail on the merits. And when the customer would not pay, the company sent him repeated text messages, even at night or in the early morning, telling him how much his house was worth, making clear that he was under surveillance, and threatening to join his sick fiancee as a party even though she was not involved in the domain name or web site. The customer resisted this pressure and hired a lawyer to stand up for his free speech, ultimately incurring tens of thousands of dollars in legal bills. Because the trademark lawsuit was utterly groundless and oppressive, and because, unless the defendant receives an award of attorney fees, the plaintiff will have succeeded in making him pay an unfair price for his free speech, the Court should grant his motion for an award of statutory attorney fees under the Lanham Act.

**Facts and Proceedings to Date**

Defendant Lawrence White, through his company, defendant Aeromedia Marketing, Inc. (jointly identified in this brief as "White"), is a dissatisfied investor in a business now owned by plaintiff Career Agents Network ("CAN" or "plaintiff"). He and his fiancee, Lorie Brady, invested $49,900 with a company called Health Career Agents ("HCA") to buy a "business in a box" that was supposed to provide them with the resources needed to become successful recruiters in the healthcare

field.  Summary Judgment Opinion (DN 62) at 2-3.  After White and Brady made this investment,

plaintiff CAN, "an international consortium of recruiting companies [that] represents candidates for

high-level jobs in a number of industries," DN 11 ¶ 9, purchased the assets of HCA.  White and

Brady soon concluded that this investment had been a waste of their hard-earned savings.  *Id.*

To express his disapproval of plaintiff, and to warn future victims, White created a web site

that said, in its entirety,

WARNING

If you are considering investing in this "opportunity", be aware that it is highly
improbable that you will earn enough to cover your investment. If you proceed with
this company you have been warned by those that know and have lost
$20,000-$150,000 by trusting them and their "plan"

*Id.*

The web site did not contain any links to any other web site, and did not even mention White's name

or provide a means for contacting White.  White Deposition (attached to Clos Affidavit as Exhibit

E), at 26.  It was a pure act of non-commercial speech criticizing plaintiff's business.  To identify

plaintiff as the target of his critical speech, White chose the domain names

"careeragentsnetwork.biz" and "careeragentnetwork.biz," and registered them through a domain

name registrar that allowed him to remain anonymous.  *Id.* at 25.  White also used a search engine

optimizing company to raise the "search rank" of his critical web site when Internet users enter the

term "career agents network" into a search engine.  *Id.* at 26; DN 62 at 3-4.

Plaintiff CAN was worried about the impact that this critical speech — in the words of

plaintiff's owners, this "cyberslander campaign" — could have on its business, and claimed that it

had lost hundreds of thousands of dollars because of the critical speech contained on the web site.

White Aff., Exh. A. However, it did not sue for defamation, no doubt because the factual statements cited on the web site were true, and the site otherwise expressed a constitutionally protected opinion. Instead, CAN sued for trademark infringement and cybersquatting, claiming that the use of its name to identify a web site about itself was impermissible under the trademark laws. It sought a temporary restraining order ("TRO") and preliminary injunction both locking the domain names and requiring that the domain names be turned over to plaintiff for the duration of the litigation. Had this relief been granted, plaintiff could have removed the critical speech from the Internet without having to show that it was false or otherwise actionable.

Plaintiff's trademark claims were squarely precluded by circuit precedent. In *Taubman v. Webfeats*, 319 F.3d 770 (6th Cir. 2003), the Sixth Circuit held both that the Lanham Act does not reach noncommercial web sites that simply provide information, favorable or unfavorable, about a trademark holder, and that the use of a trademark as the domain name for a web site about the trademark holder is not infringement so long as the underlying web site does not create confusion about whether the trademark holder is its sponsor. And in *Lucas Nursery and Landscaping v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004), the Sixth Circuit held that the cybersquatting amendment to the Lanham Act cannot be used to enjoin the use of a trademark as the domain name of a "gripe site" about the trademark holder.

Because plaintiff was proceeding ex parte, in that the defendants had not yet been identified, it knew that the precedents it cited might well be the only cases that the Court considered in deciding whether to grant a preliminary injunction suppressing the critical speech. However, plaintiff did not see fit to cite and try to distinguish the governing precedents. Instead, its memorandum in support of preliminary relief cited only cases in which defendants had been enjoined from using trademarks

as domain names to sell **competing** goods and services. DN 2, Mem. at 4-7. Although the memorandum recited language from the web site, it did not disclose to the Court the crucial facts that the site did not contain any attempt to sell goods or services, or any links to any commercial web sites. *Id.* at 3. Similarly, although plaintiff's papers contended that the use of its trademark "dilutes and tarnishes" plaintiff's mark," Byndas Aff. ¶ 7, and claimed that plaintiff's mark was "famous," Memorandum in Support of Preliminary Injunction, at 5, it did not point the Court to the Lanham Act's definition of the term famous, which requires that the mark be "widely recognized by the general consuming public of the United States," 15 U.S.C. § 1125(c)(2)(A), and it did not acknowledge that Charlotte Byndas, CAN's co-owner, had no idea what fraction of the public would recognize her company's name. Byndas Dep. at 80 (Clos Aff., Exh. D).

The Court granted the requested relief in part, enjoining any transfer of the domain name for the duration of the litigation, and ordering that the domain name registrar provide plaintiff with the identity of those who had registered the domain name. DN 9, at 3 ¶ B. However, the Court did not grant the part of the requested relief that would have placed the domain names under plaintiff's control for the duration of the litigation. DN 2, Motion at 2. Instead, it ordered that the domain names be transferred into the registry of the Court. DN 9, at 3 ¶ A.

Plaintiff then took advantage of its preliminary victory to mount a full court press that was designed to coerce White into giving up his free speech rights without having the opportunity to defend his free speech (or even to consult legal counsel). Plaintiff's counsel, Michael Khoury, sent White copies of the papers that had been filed so far, and warned White that this Court had already ruled in plaintiff's favor, suggesting that any legal resistance was futile. White Aff. ¶ 3. Although, before retaining counsel, White considered dropping his web site in order to avoid having to defend

a lawsuit, and came close to agreeing to a proposed settlement with Charlotte Byndas, one of plaintiff's co-owners, ultimately he decided not to do so. *Id.* ¶ 4. Byndas then warned White that, if he defended the lawsuit, he would be dragging Lorie Brady through his troubles even though Brady was "struggling to get well." *Id.* ¶ 5 and Exh. A. At the time, Brady had faced numerous cancer challenges and was struggling with continuing health-related issues. *Id.* ¶ 5. Plaintiff also sent an email to those of its members who it believed had worked with White before, to tell them about how, in plaintiff's opinion, White had hurt their business as well as CAN through his "cyberslander." Byndas Dep. at 81-83 and Exhibit 13, attached to Clos Aff. as Exh. D.

White consulted a lawyer, Larry Bowerman, to get advice about how to respond to this barrage. White Aff. ¶ 6. While he was sitting in Mr. Bowerman's office, White had a conversation with Byndas and Paul Helm, plaintiff's co-owners, who warned White that the case was as good as over given the Court's preliminary injunction, and that White faced the prospect of such large damages that the $40,000 being demanded in settlement was a good deal. White told Byndas and Helm that, given the amount of money that he had already invested, he couldn't afford to pay another $40,000. Byndas, however, said that she would take his house if necessary to collect the damages that White's web site had caused to the plaintiff, and that he had better settle quickly. *Id.* and Exh. B. Mr. Bowerman acknowledged that trademark law was outside his area of expertise, but warned that the case would be expensive to litigate, and recommended that White take the least expensive way out by settling the case. *Id.* ¶ 8.

Following this conversation, Helm sent White an email demanding that White give up what Helm called his "cyberslander campaign." Helm demanded that White, inter alia, surrender the domain names, apologize for his criticisms, promise never to criticize plaintiff or any of its

employees in the future, and pay $40,000 to cover plaintiff's legal fees as well as part of what Helm claimed was the hundreds of thousands of dollars of damages that had been caused by White's critical speech. *Id.* ¶ 7 and Exh. C. The terms that Helm sought to dictate also included a requirement that White sign an agreement with plaintiff that would have waived all possible claims against Health Career Agents for misrepresentations. *Id.* Exh. D, ¶ 2.

White was worried about the expense of the litigation, as well as about the impact that the litigation might have on Brady given her health. *Id.* ¶¶ 5, 9. When White did not comply immediately, Byndas began a campaign of repeated and harassing text messages to White's cell phone. *Id.* ¶¶ 12, 13. One of the messages warned White that Brady might herself be added to the litigation if White did not give in. White wrote back to implore Byndas to leave Brady out of the litigation. Byndas responded that Brady would be left out only if White immediately agreed to all of the demanded settlement terms: "If not we will have to include her in everything." *Id.* ¶ 13 and Exhibit E. Byndas then sent multiple additional text messages to White, including messages early in the morning (such as before 6 AM) and into the evening, even after 9 PM. Some of the messages contained nothing but a "smiley face" (the ":-)" emoticon); others warned White that Byndas had been in his neighborhood checking on the value of his house, and looking at his neighbors' garden, so that she knew he could afford to pay the amount of damages that had been demanded. Byndas Dep., Exh. 14 (attached to Clos Aff. as Exh. D). Byndas also threatened to deluge White with hundreds of phone calls if he did not surrender. *Id.*

In the end, White decided that he had done nothing wrong, and Brady agreed that she was willing to face the impact of the litigation on their lives. White Aff. ¶ 11. He hired a new lawyer,

Charles Clos. *Id.*[1] Plaintiff filed an amended complaint that added a count for trademark infringement to the count for cybersquatting. DN 11. The parties undertook discovery from each other and defendants moved for summary judgment, citing *Taubman* and *Lucas Nursery* as well as many cases from other circuits showing the general judicial consensus that the domain name for a web site that criticizes the trademark holder may properly use the plaintiff's trademark so long as the web site itself is either non-commercial or not confusing about whether it is the trademark holder's own web site. DN 43. In its briefs opposing summary judgment, as well as supporting its cross-motion for summary judgment, DN 54, plaintiff finally acknowledged the existence of Sixth Circuit precedent relevant to its complaint, but tried to distinguish those cases by arguing that White runs a rival business, that White's web sites supposedly were a lure for business prospects, and that his use of the domain names could be confusing because the site lacked an express disclaimer of affiliation with plaintiff. *Id.* at 8-9. The Court rejected those distinctions both as a matter of fact and as a matter of law, and entered summary judgment for defendants. DN 62.

However, White's defense of his free speech came at a substantial price — he incurred roughly $20,000 in legal fees. White Aff. ¶ 11. Seeking to recover those fees, as well as the fees for this fee application, White now asks the Court to award his fees and expenses as a prevailing party under the Lanham Act.

---

[1] White also asked undersigned counsel Mr. Levy to take the case pro bono so that White would not have to pay for private representation. As explained in his affidavit, ¶ 11, Mr. Levy decided not to take over the case on the merits, although he offered informal guidance to Mr. Clos. Public Citizen agreed to take the case for this fee application because of its concern about the impact of meritless trademark litigation on the right to criticize private companies, and the need for fee awards to encourage consumers to stand up for their rights as well as discouraging the misuse of the trademark laws to quash dissent.

**ARGUMENT**

**I.      White Should Be Awarded His Attorney Fees Because Career Agents Network Brought a Groundless Case to Suppress Critical Speech and Used Abusive Litigation Tactics to Oppress a Small Adversary.**

The Lanham Act provides for awards of attorney fees to prevailing parties in "exceptional cases."  15 U.S.C. § 1117(a).  Congress included this provision both to protect plaintiffs against deliberate infringements and "to 'provide protection against unfounded suits brought by trademark owners for harassment and the like.'"  *Eagles, Ltd. v. American Eagle Foundation*, 356 F.3d 724, 729 (6th Cir. 2004), quoting S. Rep. No. 93-1400 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7136.  The Supreme Court held in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), that the standards for fee awards in copyright cases must treat prevailing plaintiffs and prevailing defendants in an even-handed fashion, and that "defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement."  *Id.* at 527.

Recognizing the similarity between the copyright and trademark laws — both reflect a **balance** between protecting intellectual property owners while at the same time protecting the free speech interests of the public domain and of fair use — the Sixth Circuit in *Eagles Ltd.* cited *Fogerty*'s even-handedness requirement as controlling authority in trademark fee litigation as well. However, the Sixth Circuit said that in applying even-handedness, fee awards in favor of prevailing plaintiffs and prevailing defendants focus on different acts — when the plaintiff prevails, the courts focus on the exceptional quality of the infringement, but when the defendant prevails, the courts must focus on the exceptional nature of the litigation.  Drawing on a previous unreported Sixth Circuit decision which, in turn, rested on a line of authority concerning fee awards in Lanham Act

-8-

cases from the Seventh Circuit, the *Eagles* Court held that a prevailing defendant should be awarded

fees "where a plaintiff brings a suit that could fairly be described as 'oppressive.'"  356 F.3d at 728,

citing *Balance Dynamics Corp. v. Schmitt Indus.*, 208 F.3d 212 (6th Cir. Feb. 25, 2000) (mem.) and

*Finance Inv. Co. v. Geberit AG*, 165 F.3d 526, 533 (7th Cir. 1998).

This case "could fairly be described as oppressive" in several respects.  First, it was

completely groundless.  The Lanham Act cybersquatting provision could not have applied here

because that statute was intended to prevent the use of domain names with a bad faith intent to profit

"by either ransoming the domain name back to the trademark holder or by using the domain name

to divert business from the trademark holder to the domain name holder."  *DaimlerChrysler v. The

Net Inc.,* 388 F.3d 201, 204 (6th Cir. 2004).  It is not cybersquatting when a trademark is placed in

a domain name for a web site used by a dissatisfied customer to "inform . .  fellow consumers of

one's experience with a particular service provider. "  *Lucas Nursery*, *supra.*  This case was thus

foreclosed at the outset by *Lucas Nursery*, yet plaintiff never had any explanation that could

distinguish that case.

The Lanham Act infringement claim, in turn, was clearly precluded by *Taubman v. Webfeats*,

319 F.3d 770 (6th Cir. 2003), for two independent reasons. First, the careeragentsnetwork.biz web

site was completely non-commercial, and *Taubman* held that, to be consistent with the First

Amendment, the Lanham Act is limited to commercial uses of trademarks.  *Id.* at 774-775.  Second,

the domain name was used to identify the subject of criticism on a web site that had zero potential

for creating confusion about whether CAN was the sponsor of the site, but *Taubman* held that

trademark infringement claims can only be brought when there is a likelihood of confusion about

the source or affiliation of the parties' goods and services.  *Id.* at 774, 776.  Nobody, even the most

gullible Internet user, could be confused about whether White's site was sponsored by plaintiff.

Indeed, in the years since *Taubman* and *Lucas Nursery* were decided, several other circuits have endorsed the Sixth Circuit's analysis, holding that trademarks in domain names may lawfully and properly be used for non-commercial web sites expressing opinions about the trademark holder.[2] As the Sixth Circuit said in *Taubman*, White is free to shout his opinion of CAN "from the rooftops," 319 F.3d at 778, and

> the rooftops of our past have evolved into the internet domain names of our present. We find that the domain name is a type of public expression, no different in scope than a billboard or a pulpit, and Mishkoff has a First Amendment right to express his opinion about Taubman, and as long as his speech is not commercially misleading, the Lanham Act cannot be summoned to prevent it.
>
> *Id.*

The sheer groundlessness of the trademark claims in this case provides an important basis for an award of attorney fees. *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002); *National Ass'n of Professional Baseball Leagues v. Very Minor Leagues,* 223 F.3d 1143, 1147 (10th Cir. 2000). The suit's lack of merit, combined with the deliberate imposition of the cost of defending on the defendant, can alone be a sufficient basis for finding the case "exceptional" and awarding Lanham Act fees. *Door Systems v. Pro-Line Door Systems,* 126 F.3d 1028, 1032 (7th Cir. 1997); *Yankee Candle Co. v. Bridgewater Candle Co.*, 140 F. Supp.2d 111, 121-122 (D. Mass. 2001) *aff'd*, 259 F.3d 25 (1st Cir. 2001).

In addition to having brought a groundless lawsuit, plaintiff pursued the litigation in an oppressive manner. It began the case by seeking a TRO and preliminary injunction, and it obtained

---

[2] *Lighthouse Ministry v. Foundation for Apologetic Info. & Research*, 527 F.3d 1045 (10th Cir. 2008); *Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005); *Bosley Medical v. Kremer*, 403 F.3d 672 (9th Cir. 2005); *TMI v. Maxwell*, 368 F.3d 433 (5th Cir. 2004).

those orders through misleading representations of the facts and the law to the Court. Even though the Sixth Circuit has **two** decisions on point, neither was cited in plaintiff's memorandum of law in support of the TRO and preliminary injunction. The facts stated in support of the request for emergency relief also contained significant omissions (for example, no copy of the actual web page was provided, which would have shown that there were no hyperlinks to any commercial web sites) and misstatements (for example, Byndas averred that her company's mark was "famous," and plaintiff asserted that its mark had been diluted). Even in its opposition to the motion for summary judgment, CAN tried to obscure the fact that it had no way to distinguish *Taubman* by mentioning the case only in its discussion of the cybersquatting claim, while omitting the case entirely from its discussion of infringement. Courts have relied on miscitation or disregard of governing law as one factor that renders trademark litigation oppressive. *Ale House Management v. Raleigh Ale House*, 205 F.3d 137, 144 (4th Cir. 2000).

When, as here, a party seeks ex parte relief, it has an especial obligation to bring potentially adverse facts and authority to the Court's attention. *Maine Audubon Soc. v. Purslow*, 907 F.2d 265, 268-269 (1st Cir. 1990); *Jorgenson v. County of Volusia*, 846 F.2d 1350, 1352 (11th Cir. 1988); *Cedar Crest Health Center v. Bowen*, 129 F.R.D. 519, 525 (S.D. Ind. 1989). Indeed, Rule 3.3(d), Michigan Rules of Professional Responsibility, expressly requires a lawyer to make a balanced presentation of relevant facts in an ex parte proceeding, "whether or not the facts are adverse," making specific reference to TRO motions, because otherwise the lawyer may, as here, lead the court to an unjust result. Plaintiff began this case in complete disregard of this ethical requirement.[3]

---

[3] Plaintiff has indicated that it plans to argue that the inclusion in the Court's preliminary injunction order of a finding that success on the merits was likely shows that it had a colorable basis for bringing this action. Given that the finding was made ex parte, and in response to briefs that

Plaintiff then tried to take unfair advantage of the TRO and preliminary injunction by presenting them to White as showing that the Court had already ruled for plaintiff, and thus that he had no choice but to accept its onerous settlement terms, including a waiver of any claims for misleading procurement of his investment, a non-disparagement clause, and the payment of $40,000 in attorney fees and damages. Both plaintiff's lawyer and its co-owner made this spurious claim to White, without explaining to him that the order did not reflect a decision by the Court on the merits of the case, let alone that it had been obtained by a misleading presentation to the Court of the facts and the law. Indeed, plaintiff misrepresented to White the extent to which the Court had ruled in its favor, because although plaintiff's memorandum asked the Court to order that the domain names be turned over to plaintiff for the duration of the litigation, DN 2, Mem. at 7, the Court only ordered that the domain names be placed on hold.

And then, when White did not immediately accept the terms that had been demanded of him, plaintiff embarked on a campaign of harassment, threatening to broaden the suit groundlessly to include Lorie Brady as a defendant, even though she had no involvement in the selection of the domain names or the creation of the web site, even though plaintiff had no evidence that she was involved, and even though plaintiff knew that she had faced numerous cancer challenges and was struggling with continuing health-related issues, and hence was particularly vulnerable. And when that was not enough, plaintiff threatened that it would seize White's house for the payment of its damages and attorney fees, then told him his residence was under surveillance and sent harassing text messages to his cell phone, including messages in the early morning hours and at night, and threatened to inundate his phone with telephone calls. Having discovered White's identity, plaintiff

---

omitted both controlling law and adverse facts, that argument should not be accepted.

also sent an email denouncing him to members of its network who had worked with him and who, plaintiff apparently believed, could be persuaded to express their anger to him. The oppressive manner in which plaintiff tried to force a settlement of its utterly groundless lawsuit is yet another reason supporting the conclusion that this lawsuit was "exceptional."

Moreover, the evidence plainly shows that the litigation was not motivated by any genuine concern about the possibility that members of the public might experience confusion about whether his web site was sponsored by plaintiff, but was intended as a remedy for the critical speech posted on the web site. Plaintiff's co-owner, Charlotte Byndas, admitted this during her deposition when interrogated about her harassing text messages: "[R]eally the thrust of this was to get the information on the Internet down. And so, I mean, up to this point, he was not very cooperative in helping us get the information down, and so, you know, we were trying desperately to get him to do that." Clos Aff, Exh. D, at 97. Byndas' email to some of plaintiff's members, which was attached to her deposition as Exhibit 13 (and is provided as part of Exhibit D of the Clos Affidavit), explained that plaintiff had brought suit against White over his "cyber slander." The email did not express any concern about the possibility that Internet users might be confused about the source of the statements on the site and mistakenly attribute them to plaintiff, but rather complained about the "false information" on the web sites and White's involvement in "cyber slander" that posed a risk to the reputation of her company. Both Byndas and her co-owner Paul Helm told White that the damages they wanted him to pay were intended as compensation for the damages caused to plaintiff's business by White's **criticism** rather than by use of the mark, White Aff. ¶ 6 and Exh. A, C, and it was no coincidence that the settlement agreement that they sought to impose on him included an apology for the criticism and a non-disparagement commitment — typical relief in a defamation case, but not

-13-

in a trademark case. As the court said in *Universal Communication Systems v. Lycos, Inc.*, 478 F.3d 413, 423 (1st Cir. 2007), the injury to the trademark holder's reputation caused by criticism that uses the trademark holder's name is simply not trademark injury and hence cannot be remedied by a trademark lawsuit. The bringing of this spurious trademark claim for the ulterior purpose of quashing White's critical speech strongly supports the motion for an award of attorney fees.

One more factor should be considered in the award of attorney fees in this case. Although plaintiffs have a natural incentive to bring meritorious trademark cases because they can hope to secure awards of damages that may offset the costs of litigation, a defendant has no countervailing financial incentive to **defend** a trademark case, even when the case is utterly groundless. Indeed, in a case like this one, where White created a web site and used the trademark, not to draw customers to his business, but to criticize plaintiff, he gets nothing from a successful defense besides the patriotic pleasure of having stood up for his First Amendment rights. Indeed, the prospect of expensive litigation to defend free speech rights that stood to earn him not a dime came close to deterring White from defending this case. White Affidavit ¶¶ 8-9.

Courts have recognized the need to create incentives for the defense of trademark litigation when the defense advances the public good by preventing the misuse of trademark law to suppress speech, even when it is just commercial speech, as a large company picks on an underfunded opponent in the hope that the mere cost of a self-defense will drive the defendant into submission. *Noxell Corp. v. Firehouse No. 1 Barbeque Rest.*, 771 F.2d 521, 526-527 (D.C. Cir. 1985); *Ale House Mgmt. v. Raleigh Ale House*, 205 F.3d 137, 144 (4th Cir. 2000). *See also Door Sys. v. Pro-Line Door Sys.,* 126 F.3d 1028, 1032 (7th Cir. 1997) ("a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a

good case and is not trying merely to extract a settlement based on the suit's nuisance value"); *Wal-Mart Stores v. Samara Bros.,* 529 U.S. 205, 214 (2000) (noting problem of "anti-competitive strike suit[s]" invoking trademark claims).

As the Seventh Circuit said in *Woodhaven Homes & Realty v. Hotz*, 396 F.3d 822, 824 (7th Cir. 2005), "[w]ithout the prospect of such an award, [a defendant] might be forced into a nuisance settlement or deterred all together from exercising his rights." Although *Woodhaven* was decided under the Copyright Act, similar considerations apply when a trademark defendant successfully defends against a suit aimed at his free speech rather than at vindicating interests genuinely protected by the trademark laws. Similarly, the Ninth Circuit remanded for consideration of an award of attorney fees when a huge national company brought an action against an artist who created parodies of its trademarked "Barbie" character. *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 816 (9th Cir. 2004). Noting that the defendants' "use constituted nominative fair use and was protected by policy interests in free expression," the court directed the district court to decide whether the plaintiff's claims were "groundless or unreasonable." *Id.* So, too, this was an exceptional case brought to suppress White's free speech, and the Court should award attorney fees.

## II.    The Court Should Award $36,324.82 in Attorney Fees and Expenses.

The amount of attorney fees to be awarded is determined by the lodestar method, whereby the Court assesses the number of hours reasonably expended on the case as shown by the lawyers' time records, and multiplies that by the reasonable hourly rates of the attorneys involved. *Imwalle v. Reliance Medical Products*, 515 F.3d 531, 551-552 (6th Cir. 2008); *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 617 (6th Cir. 2007); *McCombs v. Meijer, Inc.*, 395 F.3d 346, 361 (6th Cir. 2005). Fees should also be awarded for time spent litigating the issue of attorney fees. *Weisenberger v.*

*Huecker*, 593 F.2d 49, 53-54 (6th Cir. 1979).

The attached affidavits of Charles Clos and Paul Alan Levy, and the time records attached to those affidavits, lay out the time spent by each of their firms on the case, the qualifications of counsel, and the reasonable hourly rates for each. Detailed information regarding the skill and expertise of defendants' counsel is contained in their affidavits. White's legal team included counsel with extensive experience in litigation at the intersection of intellectual property and free speech, who has handled many of the cases that set the precedents on which defendants' arguments were based, as a local practitioner with twenty years of litigation experience. The experience and specialized expertise of counsel enabled defendants to pursue this case successfully and efficiently. Hourly rates "are to be calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). This evidence produces the following table summarizing the fees sought in this case:

| Attorney | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Charles E. Clos | $210 | 30 | $6,300.00 |
| Charles E. Clos | $190 | 27.5 | $5,225.00 |
| Shannon L. Wirth | $175 | 35.7 | $6,247.50 |
| William M. Clos | $140 | 6 | $840.00 |
| Messenger | $15 | 4.8 | $72.00 |
| Larry Bowerman[4] | $175 | 2 | $350.00 |
| Paul Alan Levy | $465 | 36.5 | $16,972.50 |
| Totals | | 142.5 | $36,007.00 |

---

[4]White's affidavit, ¶ 6, reveals that, when he was first deciding whether to surrender his rights, he paid Larry Bowerman, Esquire, $350 for two hours of his time in evaluating the prospects for defending the litigation.

The Clos affidavit also details the $417.82 in expenses incurred in defending this case on the merits (exclusive of the deposition transcript costs that have already been taxed by the clerk).

## CONCLUSION

The Court should award defendants their attorney fees and expenses in the amount of $36,324.82.

Respectfully submitted,


<u>/s/ Paul Alan Levy</u>
Paul Alan Levy (DC Bar 946400)
Gregory A. Beck (DC Bar 494479)

Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C. 20009
(202) 588-1000
plevy@citizen.org

<u>/s/ Charles Clos</u>
Charles Clos (P43380)
CLOS RUSSELL & WIRTH, P.C.
35551 Ford Road, Suite 100
Westland, Michigan  48185
(734) 326-2101
cclos@lawyersmichigan.com

Attorneys for Defendants

March 26, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I electronically filed the foregoing paper with the Clerk of the Court using the electronic filing system which will send notification of such filing to the following:

Joan Lowenstein, Esquire
Michael Khoury, Esquire

All parties in the case are represented by counsel who receive service through the ECF system.

      /s Paul Alan Levy

Paul Alan Levy (DC Bar 946400)

     Public Citizen Litigation Group
     1600 20th Street, N.W.
     Washington, D.C. 20009
     (202) 588-1000
     plevy@citizen.org

     Attorney for Defendants

March 26, 2010