**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CAREER AGENTS NETWORK, INC.,

      Plaintiff,

v.                                                                  Case No. 09-CV-12269

careeragentsnetwork.biz,
careeragentnetwork.biz,
LAWRENCE R. WHITE, and
AEROMEDIA MARKETING, INC.,

      Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR ATTORNEY FEES

Pending before this court is Defendants' March 25, 2010 motion for attorney fees. The matter has been fully briefed and the court concludes that a hearing on the motion is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant the motion in part and deny it in part.

## I. BACKGROUND

Plaintiff Career Agents Network, Inc. ("CAN") sells recruiting industry business opportunities. (Pl.'s Mot. for Summ. J. Resp. at 3.) CAN provides training, software, and other support services to the recruiting entrepreneurs who purchase a membership in its network. (Defs. Mot. Summ. J. Br. at 2-3.) In return, members pay CAN a portion of their recruiting fee when they place a candidate. Lawrence White paid $49,000 to Health Career Agents, Inc. ("HCA") for a similar business opportunity. (Defs.' Mot. for Summ. J. Br. at 3.) CAN later purchased HCA's assets. (Pl.'s Mot. for Summ. J. Resp.

at 3.)  White avers that he "soon discovered that the 'business opportunity' was not as lucrative as represented."  (White Aff. at ¶ 6, Dec. 22, 2009.)  White registered the domain names careeragentsnetwork.biz and careeragentnetwork.biz as an agent of AeroMedia Marketing, Inc.  (*Id.* at ¶ 3.)  White uploaded a single page of text to the websites.  (*Id.* at ¶ 15; Defs. Br. Summ. J. Ex. E.)  The text amounted to a warning that CAN's business opportunities were a bad investment.  (*Id.)*

On June 12, 2009 Plaintiff filed its complaint against Defendants careeragentsnetwork.biz and careeragentnetwork.biz ("Domains").  The complaint alleged that the owner of the websites, who was at that time unknown to the court and to Plaintff, registered the Domains with a "bad faith intent to profit" and therefore violated the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. 1125(d).  (Pl.'s Compl. ¶¶ 13, 19-22.)  Plaintiff then filed a motion for a temporary restraining order and permanent injunction, which the court granted in part by requiring the registrar of the Domains to reveal who owned them.  On June 16, 2009 Plaintiff amended its complaint to join as Defendants Lawrence White and Aeromedia Marketing, Inc., the owners of the Domains, and to add a trademark infringement claim under 15 U.S.C. § 1125(a).  Plaintiff maintained that Defendants were using the domains to confuse consumers and to siphon business from CAN to Defendants.  Defendants responded that the Domains were merely "gripe" websites that White created to voice his dissatisfaction with CAN as a consumer of its services.

Defendants filed their motion for summary judgment on December 22, 2009, and the court granted the motion on February 26, 2010.  Defendants now seek attorney fees and expenses pursuant to 15 U.S.C. § 1117(a) in the amount of $36,424.82 based on

hours billed for both litigating the suit through summary judgment and litigating the issue of attorney fees.  (Defs.' Mot. for Atty's Fees.)  Plaintiff contends that attorney fees are not warranted under the Lanham Act and that the fees requested are excessive.

## II.  STANDARD

Under the general American rule, unless Congress provides otherwise, parties to litigation are to bear their own attorney fees.  *Fogerty v. Fantasy*, *Inc.*, 510 U.S. 517, 533 (1994) ("Unlike Britain where counsel fees are regularly awarded to the prevailing party, it is the general rule in this country that unless Congress provides otherwise, parties are to bear their own attorney fees").  Pursuant to 15 U.S.C § 1117(a), the court may grant attorney fees to the prevailing party in a Lanham Act action in "exceptional cases."  15 U.S.C § 1117(a); *Hindu Incense v. Meadows*, 692 F.2d 1048, 1052 (6th Cir. 1982).  Either a prevailing plaintiff or a prevailing defendant may be awarded fees under § 1117(a).  *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004).  In applying 15 U.S.C. § 1117(a) to a prevailing defendant, a case is exceptional where a plaintiff brings an "oppressive" suit.  *Id.* (citing *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, No. 98-1143, 2000 WL 226959, at *2 (6th Cir. Feb. 25, 2000)).  The test for whether a Lanham Act suit is oppressive "requires an objective inquiry into whether the suit was unfounded when it was brought and a subjective inquiry into the plaintiff's conduct during litigation."  *Id.*  "No one factor is determinative, and an infringement suit could be 'exceptional' for a prevailing defendant because of (1) its lack of any foundation, (2) the plaintiff's bad faith in bringing the suit, (3) the unusually vexatious and oppressive manner in which it is prosecuted, or (4) perhaps for other reasons as

well." *Id.* at 729 (citing *National Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1146-47 (10th Cir. 2000)).

If the court determines that fees are appropriate because the case is "exceptional" under 15 U.S.C § 1117(a), the court must then arrive at a reasonable amount of fees to award. *See Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1400 (6th Cir. 1995). The "lodestar" approach is the proper method for determining the amount of reasonable attorney fees. *Id.* at 1401 (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563 (1986)). In making the "lodestar" calculation, "[t]he most useful starting point . . . is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* (alterations in original and citation omitted.) "The party seeking attorney fees bears the burden of proof on the number of hours expended and rates claimed." *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999).

### III. DISCUSSION

#### A. Awarding Attorney Fees Under 15 U.S.C. § 1117(a)
#### 1. Objective Inquiry into Whether the Suit was Unfounded

An objective inquiry into whether the suit was unfounded favors granting attorney fees to Defendant. *Eagles, Ltd.*, 356 F.3d at 728. The court will analyze the foundation of the first amended complaint rather than the initial complaint seeking a preliminary injunction because at the time Plaintiff brought its Motion for a Temporary Restraining Order, the factual record was insufficiently developed to fully assess the merits of the claims – Defendant White had not yet been identified.

Count I of Plaintiff's amended complaint, which alleged cybersquatting under 15 U.S.C. § 1125(d), was without merit, and this favors granting Defendants attorney fees. (Am. Compl. at 5.) Plaintiff's identification of White as the operator of careeragentsnetwork.biz should have resolved any doubt whether the § 1125(d) cybersquatting claim could have been well-grounded under *Lucas Nursery*. White was without question an unhappy consumer of CAN's services rather than a competitor or a person in the business of selling domain names at an extortionate rate. As the court found at summary judgment, "it strains credulity that Defendants set up these Domain Names as a means of generating business." (2/26/10 Order at 19.) White had purchased Plaintiff's predecessor's recruiting "business in a box" for $49,000, and Plaintiff was to receive a cut of any placements White might make using its services. As a consumer, therefore, rather than as a competitor, Defendant White used the Domains to complain about Plaintiff's services.

Plaintiff contends that its cybersquatting claim was colorable and that the court merely came to disagree with Plaintiff's position. (Pl.'s Mot. Att'y Fees Resp. at 3-4) But *Lucas Nursery* held that a consumer website created, not with a bad faith intent to profit, but only to complain about allegedly poor performance does not constitute cybersquatting under 15 U.S.C. § 1125(d) even where the site's domain is the business's name verbatim. *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809-10 (6th Cir. 2004). That is exactly the case here: Defendant White created and maintained websites incorporating Plaintiff's name as their domains to do nothing more than complain about the recruiting business opportunity he had purchased from

Plaintiff.  Thus, *Lucas Nursery* easily resolved Count I (cybersquatting) in favor of Defendants.  Count I was objectively unfounded.[1]

Count II of Plaintiff's amendment complaint, which alleged a trademark infringement under 15 U.S.C. § 1125(a), was weak but colorable and therefore counsels against granting attorney fees to Defendant.  (Am. Compl. at 5.)  Defendant contends that under *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003), non-commercial websites that create no confusion as to their sponsorship do not violate 15 U.S.C. § 1125(a) and that Defendant White's gripe site was neither commercial or confusing. Indeed, *Taubman* supported the Defendant's contention that careeragentsnetwork.biz did not violate Plaintiff's trademark and the court relied on it in resolving this case at summary judgment.  (2/26/10 Order at 16-17, 22-25).  But *Taubman* did not squarely resolve the trademark issues in this suit.  *Taubman* holds that a consumer gripe site that includes a derogatory moniker such as "sucks" as an addendum in its domain demonstrates that the named entity does not sponsor the site and plainly cannot constitute trademark infringement under the Lanham Act.  *Taubman,* 319 F.3d at 778-79 ("'taubmansucks.com' removes any confusion as to source. We find no possibility of confusion and no Lanham Act violation.").  Such is not the case here: Defendants' gripe site domains do not include an equivalent derogatory phrase clearly signifying that the

---

[1]*Lucas Nursery* could not have resolved the cybersquatting claim in favor of Defendant at the preliminary injunction stage. Neither the court nor, it appears, Plaintiff was operating with full knowledge of the facts.  Before Plaintiff identified White as the owner of careeragentsnetwork.biz, it emphasized in its Motion for a Temporary Restraining Order that the owner of the website was likely using the website to compete unfairly or planning to profit from selling the Domains to CAN, and stressed the need for immediate relief.  Plaintiff did not cite *Lucas Nursery* in its brief.

named entity does not sponsor the website as did the domain in *Taubman.* Plaintiff

therefore had a colorable basis for distinguishing *Taubman* and for pursuing its

trademark infringement claim. Accordingly, the court finds that Count II, by itself,

counsels against granting attorney fees.

In sum, Counts I and II, taken separately, pull the court in opposite directions on

the question of the suit's foundation. But the combination of the plainly meritless

cybersquatting claim (Count I) with the colorable but weak infringement claim (Count II)

weighs in favor of Defendant. The § 1125(d) cybersquatting claim lacked foundation in

view of *Lucas Nursery.* The § 1125(a) trademark infringement claim was, at best,

lacking in vigor. The suit as a whole therefore stood on thin ice. On balance, an

objective inquiry reveals that the suit was "oppressive" because it was unfounded, and

favors granting attorney fees to Defendant.

### 2. Subjective Inquiry into Plaintiff's Conduct

The test for "oppressiveness" requires a subjective inquiry into the plaintiff's

conduct. *See Eagles,* 356 F.3d 724, 728. The test includes an assessment of the

plaintiff's motivation for bringing the suit and the manner in which the plaintiff

prosecuted it. *Id.* Defendants contend that 1) Plaintiff abused the Lanham Act because

it brought the suit to suppress Defendant White's criticism of Plaintiff's product; 2)

Plaintiff harassed Defendant White to try to coerce a settlement; 3) Plaintiff failed to cite

key Sixth Circuit law in its motion for a temporary restraining order. Plaintiff responds

that it brought the suit in an effort to stop Defendants from competing unfairly, that the

parties have been cooperative, and that it did not fail to cite controlling law in at the

preliminary injunction stage of this litigation.

First, Plaintiff's apparent motivation for bringing the suit marginally favors granting attorney fees. *National Ass'n of Prof'l Baseball Leagues, Inc.*, 223 F.3d at 1146-47. Plaintiff argues in its briefs that it brought the suit to stop White from competing unfairly and from confusing consumers with his Domains, but the court finds that Plaintiff's principal motivation was to silence Defendant White's criticism of Plaintiff's business. Plaintiff's corporate agents have expressed little concern that White's Domains confuse consumers or may be offered for sale at an exorbitant rate. Rather, they have expressed more interest in silencing White's criticism with this suit. On July 13, 2009, for instance, Paul Helm, Plaintiff's president and 50% shareholder, emailed White Plaintiff's settlement terms. (White. Aff. Ex. C at 9, Mar. 3, 2010.)[2] The settlement terms made demands of both White and Lorie Bradie, White's fiancee and business partner. (*Id.*) Term number seven appears particularly revealing of what Plaintiff was trying to achieve with this suit: Plaintiff sought "[a]n agreement signed by both Larry White and Lorie Brady to never make any disparaging statement . . . about . . . . Career Agents Network . . . in any way." (*Id.*) Furthermore, in her deposition, Charlotte Byndas, Plaintiff's chief operating officer and the other 50% shareholder, stated that "the thrust of this was . . . to get the information on the Internet down" and that Plaintiff was "trying desperately to get [White] to do that." (Byndas Dep. 97:4 - 9.) The "information on the Internet" to which she referred, of course, was White's criticism of Plaintiff's product. These statements from Plaintiff's owners and top corporate agents are reasonably clear in substance: the object of this Lanham Act suit was to silence

---

[2] Plaintiff does not contest the authenticity of this email.

White's criticism of Plaintiff. The problem, of course, is that the Lanham Act was intended to protect businesses against cybersquatters and confusing uses of their trademarks, *Eagles, Ltd.*, 356 F.3d at 729, and does not empower businesses to silence unhappy customers who wish to "[inform] fellow consumers of [their] experience with a particular service provider . . . ." *Lucas Nursery*, 359 F.3d at 811. Plaintiff's apparent motivation for bringing the suit therefore favors granting attorney fees.

Second, Plaintiff's conduct during settlement negotiations with Defendant White favors granting attorney fees, if at all, by a much closer margin than does Plaintiffs' apparent motivation. Plaintiff contends that Byndas's text messages to Defendant White's cellular phone were merely attempts to reach out to White because, as White acknowledged, he had expressed interest in settling without an attorney. (Pl.'s Mot. Att'y Fees Resp. at 6.) Plaintiff also emphasizes that Byndas and White knew each other and that her contact with him was accordingly less formal. (*Id.*) That point, as well, is not contested. Defendant argues, however, that the text messages were attempts to strong arm a *pro se*[3] defendant into settling baseless claims. (Defs.' Br. at 12.)

Certain of Byndas's communications with Defendant White may in fact approach the boundary between the ordinary rough and tumble of settlement negotiations and

---

[3]At this time, Plaintiff had retained Jaffe Law to represent it in this matter. Plaintiff's counsel had obtained a temporary restraining order and amended the complaint to join White on July 17, 2009. Byndas sent the text messages between July 11 and July 18, 2009. White had not yet retained Charles Clos, who entered an appearance on July 29, 2009. On the other hand, it was Byndas, not Plaintiff's attorney, who was in touch with White during this time, and in this sense the relationship was equivalent to two *pro se* business people negotiating with each other.

harassment, although Byndas and White's existing relationship adequately explains the informal manner in which they communicated. Indeed, it was White who suggested that Byndas may correspond with him by text message. (White Aff. Ex. A, Mar. 3, 2010.) Over the course of the next four days, Byndas sent approximately thirteen texts, an entirely unremarkable four per day. (Byndas Dep. at 90:20; Clos Aff. Ex. D at 203-08). Byndas sent one of these messages at 5:10 AM and another at 5:57 AM. (*Id.*) It is not known at what time White became aware of these early-morning messages. The court observes, however, that he may not have heard them arrive because, as he stated in an email to Byndas five days prior, he was "not checking [his] email as frequently [sic] and had the telephone ringers silenced . . . ." (White Aff. Ex. A, Mar. 3, 2010.)

In another text, Byndas intimated somewhat cryptically that she had been near White's house, perhaps near a neighbor's garden, (Clos Aff. Ex. D at 206), but she was unclear about the reason she brought the matter up. In her deposition, Byndas stated that she had merely driven past White's house as she was passing through the area. (Byndas Dep. 96: 2-3.) White spoke of her conducting "surveillance," (White Aff., ¶ 13, Mar. 3, 2010.), but there was no further mention made that the court can find. Byndas sent two texts asking whether flooding White's home with phone calls or contacts from other business partners would persuade him to respond to her text messages, which he apparently had been avoiding; she continued to ask why there was no response while demanding that White "pull those BLOGS down." (*Id.* at 206-07.) There is no evidence, however, that anything came of Byndas's suggestion that White would receive multiple phone calls or contacts from other business partners.

Byndas sent a number of text messages that consisted of little more than a colon followed by a space and a parenthesis, a symbol referred to at various points in the Byndas deposition as a "smiley face," a "winky," or an "emoticon." (Byndas Dep. 90:21-26, 91). Byndas did not remember why she sent them, (*Id.* at 91:7-25, 93:11-13), and White did not mention them in his affidavit, (White Aff. Ex. A, Mar. 3, 2010.) Whatever term may properly describe the symbol, it does not appear to convey anything threatening or in any other way support a claim of vexatious behavior.

Byndas's communications were repetitive and to some extent intrusively timed. From the face of the communications, it appears that at least some portion of the repetition was due to White's unresponsiveness after asking Byndas to contact him via text message. Overall, the content and tone of the several text messages indicate that they can fairly be called aggressive: as Byndas explained to White, Plaintiff's position was that White's actions had "caused [Plaintiff] hundreds of thousands of dollars in damage." (White Aff. Ex. A, Mar. 3, 2010.) The court does not, however, view these communications in context as "*unusually* vexatious and oppressive." *Eagles,* 356 F.3d at 728 (emphasis added). As the court observed above, the most that can be said about these communications between individual parties – people who have known each other for some time – is merely that they approach the boundary of inappropriate harassment. They do not obviously cross the line.

Third, in light of the Plaintiff's dubious motivation and borderline settlement tactics, deterrence considerations favor granting attorney fees. The possibility of an award of attorney fees under the Lanham Act is meant to protect defendants against "'unfounded suits brought by trademark owners for harassment and the like.'" *Eagles,*

*Ltd.*, 356 F.3d at 729.  As Chief Judge Posner noted writing for the 7th Circuit, "a [Lanham Act] suit can be oppressive because of lack of merit even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying to merely extract a settlement based on the suit's nuisance value."  *Door Systems v. Pro-Line Door Systems*, 126 F.3d 1028, 1032 (7th Cir. 1997).  In this case, Plaintiff's suit can be found "oppressive" – even *if* it were brought in good faith – because the suit threatened to stop a consumer from criticizing Plaintiff's product on a legal basis that approached groundlessness, as discussed above.  The suit thus attempted to extract a price for the exercise of Defendant's First Amendment rights.  To defend his right to express online his dissatisfaction with CAN's services, Defendant White has been billed nearly $20,000 in legal fees. (White Aff. at ¶ 11., Mar. 25, 2010.)  Indeed, it is somewhat surprising that White declined to settle.  At one point, White faced a $40,000 settlement demand, advice of his counsel[4] to settle quickly, and predictions from Byndas that if he didn't settle, his fiancee/business partner would be "dragged into" a suit that he was told he would surely lose because the court had granted Plaintiff's request for a preliminary injunction.  (Id. at ¶ 3-11.)  Other consumers in similar situations might chose to allow themselves to be silenced.  Just as in the copyright context, "without the prospect of [an award of attorney fees]," a defendant "might be forced into a nuisance settlement or deterred altogether from exercising his rights."  *Assessment Tech. of Wis., LLC v.*

---

[4]Mr. Bowerman advised White on this matter at the time.  (White Aff. at ¶ 6., Mar. 25, 2010.)  White avers that Bowerman advised him to "get out of the case with the best deal [he] could get" because Bowerman expected that it would be very expensive to defend the suit.  (Id. at ¶ 9.)  White did not to settle and later retained Mr. Charles Clos. (Id. at ¶ 11.)  Bowerman did not enter an appearance in this case.

*WIREdata, Inc.*, 361 F.3d 434, 437 (7th Cir. 2004).  Granting attorney fees will therefore 1) encourage consumers to exercise and defend their First Amendment right to criticize matters with which they disagree or are dissatisfied, 2) encourage attorneys to defend against abusive uses of the Lanham Act even where a defendant cannot afford to pay out of pocket, and 3) discourage plaintiffs from misusing the Lanham Act to oppress critical speech.

Fourth, the court finds that Plaintiff's failure to cite controlling law in its brief in support of its motion for a temporary restraining order ("TRO") favors granting attorney fees. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000).  Defendants contend that Plaintiff should have cited both *Taubman* and *Lucas Nursery* in its TRO brief.  (Defs.' Mot. Att'y Fee Br. at 15-16.)  Plaintiff correctly points out that *Taubman* was not relevant at the preliminary injunction stage because Plaintiff alleged only cybersquatting, and *Taubman* is a trademark infringement case.  (Pl.'s Mot. Att'y Fees Resp. at 3.)  Plaintiff also argues that it was operating under the assumption that the owner of the Domains was a competitor and therefore that *Lucas Nursery*, a consumer gripe site case, was not relevant.  (*Id.*) The websites' content, however, amounted to nothing more than a warning that CAN membership was a bad investment and clearly suggested that the Domain owner was more likely a disgruntled customer than a commercial competitor. (White Aff. at ¶ 15, Dec. 22, 2009; Defs. Br. Summ. J. Ex. E.)   In light of the strong possibility that the owner of the domains was a consumer, *Lucas Nursery* was a relevant case, even at the preliminary injunction stage of this litigation.  Furthermore, Plaintiff had a heightened duty to present dissonant facts and law as it sought an injunction *ex parte.  Maine Audubon Soc. v. Purslow*, 907 F.2d 265,

13

268 (1st Cir. 1990) ("[T]he court is entitled to expect an even greater degree of thoroughness and candor from unopposed counsel than in the typical adversarial setting."). The court therefore finds that Plaintiff was remiss in its failure to cite *Lucas Nursery*.

An objective inquiry into the suit's foundation supports granting attorney fees to Defendant, while a subjective inquiry into Plaintiff's conduct during the litigation only marginally supports the same conclusion. Considerations of deterrence tip the balance in favor of awarding fees.

## B. The Amount of Attorney Fees and Costs

Defendants move for $36,324.82 in fees: $18,684.50 for work on the main case (based on 99.2 attorney hours at hourly rates ranging from $140.00 to $210.00 and 4.8 hours of messenger service at the hourly rate of $15.00); $16,972.50 for work on the motion for attorney fees (based on 36.5 attorney hours at the hourly rate of $465.00), $417.82 in expenses that the clerk has not already taxed, and $350.00 that White paid an attorney with whom he consulted but who never appeared in the suit (based on two attorney hours at the hourly rate of $175.00.) (Defs.' Mot. Att'y Fee; Defs. Mot. Att'y Fee Br. at 16.) Plaintiff argues that 1) the fees claimed for work on both the main case and the Motion for Attorney Fees are excessive; 2) Defendants cannot recover costs not already taxed; and 3) Defendants cannot recover fees for an attorney who did not enter an appearance in this case. (Pl.'s Mot. Att'y Fee Resp. at 6.)

## 1. Fees for Main Case

First, a reasonable hourly billing rate is generally calculated according to the prevailing market rates in the relevant community. *Blum v. Stenson,* 465 U.S. 886, 897

(1984).  The Sixth Circuit has held that a $200.00 hourly rate is reasonable for legal

work in several types of litigation.  *See, e.g., Auto Alliance Int'l v. U.S. Customs Serv.*,

155 Fed. Appx. 226, 228 (6th Cir. 2005) (finding that "[t]he district court's $200 flat rate

is well within the market rate for the Eastern District of Michigan" in a Freedom of

Information Act case); *Lamar Advertising Co. v. Charter Tp. of Van Buren*, Nos. 04-2500

& 04-2521, 2006 WL 1133309, at *3 (6th Cir. Apr. 26, 2006) (approving $200 hourly rate

in a 42 U.S.C. § 1983 case involving Detroit area counsel).[5]  Here, Defendants' main

case counsel have requested hourly rates ranging from $140.00 to $210.00.  (Defs. Br.

at 16.)  The court finds that these rates are consistent with Sixth Circuit precedent.   Mr.

Charles Clos's litigation experience and other credentials warrant the full market rate for

the Eastern District of Michigan (Clos Aff. Ex. C).  Defendants' other counsel are less

experienced, and Defendants have reasonably requested reduced rates for their time.

The court will therefore award the hourly rates that Defendants' counsel request for their

work on the main case.

    Next, a complete "lodestar" calculation requires that the hours billed be

reasonable.  *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan*, 46 F.3d at 1400.

Plaintiff does not make any specific objections to the amount of time Defendants'

counsel billed for their work on the main case.  After reviewing the submitted time-

_____

[5]Although unpublished decisions in the Sixth Circuit are not binding precedent,
s*ee Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir 1996) (Unpublished opinions "carry no
precedential weight [and] . . . have no binding effect on anyone other than the parties to
the action."), their reasoning may be "instructive" or helpful.  *See Boyd v. Yukins,* 99
Fed. Appx. 699, 703 (6th Cir. 2004) ("Our unpublished case of *Mix v. Robinson,* 64 Fed.
Appx. 952, 957-58 (6th Cir. 2003), is instructive."); *Combs v. Int'l Ins. Co.*,354 F.3d 568,
593 (6th Cir. 2004) ("Although *Willits [v. Peabody Coal Co.,* 188 F.3d 510, 1999 WL
701916 (6th Cir. Sept. 1, 1999)] is an unpublished opinion, its reasoning is instructive.").

15

sheets, the court concludes that the hours Defendants' counsel billed for the main case are reasonable. (Clos. Aff. Ex. B). Defendants' counsel spent 124.50 hours on the main case, but billed only 104. (*Id.* at ¶ 13.) The case spanned only 10 months, involved limited discovery, and was resolved at summary judgment. The court finds that approximately 100 hours is not an unreasonable number of hours to bill on a case of this complexity. The court will therefore grant Defendants' request for 104.00 hours as time reasonably billed in the main case.

Defendants also request $350.00 for a two hour consultation White had with an attorney who did not enter an appearance in this case. (White Aff. ¶ 6., Mar. 25, 2010.) The court has the discretion to award attorney fees for work done before counsel enters an appearance. *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991). Here, however, Mr. Bowerman never entered an appearance at all; White merely consulted him about defending this case but then retained other counsel. (White Aff. ¶¶ 6, 11, Mar. 25, 2010.) The court will not award the fees White incurred as he shopped around for counsel to represent him in this matter and therefore will deny the requested $350.00 for Bowerman's consultation.

Defendants also request a total of $417.82 in expenses which include copying fees, traveling costs, and other expenses incident to Defendants' counsel's work on this case. (Clos Aff. ¶ 15, Ex. C.) Defendants further request $72.00 for messenger fees. (*Id.* at ¶ 13.) The court determines that these costs are reasonable legal costs associated with this litigation and may properly be awarded. The court will therefore award $489.82 to Defendants' counsel for expenses and messenger fees.

In sum, the total amount of reasonable attorney fees and costs for work on the

main case is $19,102.32 based on 104 hours at rates ranging from $140.00 to $210.00

(30 hours at $210 per hour, 27.5 hours at $190 per hour, 35.7 hours at $175 per hour, 6

hours at $140 per hour, and 2 hours at $175 per hour) and $417.82 in other reasonable

expenses.

## 2. Fees for Motion for Attorney Fees

Finally, Defendants seek $16,972.50 in attorney fees for 36.5 hours of work on

this Motion for Attorney Fees at a rate of $465.00 per hour.[6]  (Defs.' Br. at 16.)  Fees

should be awarded for time spent litigating the issue of attorney fees.  *Weisenberger v.*

*Huecker*, 593 F.2d 49, 53-54 (6th Cir. 1979).

Plaintiff contends that the fees for time spent on this Motion are disproportionate

to those requested for work on the main case.  The court agrees that an hourly rate of

$465.00 is excessive.  Under Sixth Circuit law, "the 'prevailing market rate' is that rate

which lawyers of comparable skill and experience can expect to command *within the*

*venue of the court of record*, rather than foreign counsel's typical charge for work

performed within a geographical area wherein he maintains his office. . . ." *Adcock-Ladd*

---

[6]In making a lodestar calculation for work performed by Defendants' counsel, it is
not significant that counsel performed its work *pro bono*.  (*See* Levy Aff. at ¶ 9.)  Fees
may still be awarded at a reasonable rate for work done by public interest firms.   *See*
*Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989) ("That a nonprofit legal services
organization may contractually have agreed not to charge any fee of a civil rights
plaintiff does not preclude the award of a reasonable fee to a prevailing party in a §
1983 action, calculated in the usual way."); *Blum v. Stenson*, 465 U.S. 886, 895 (1984)
(citing 8 Empl. Prac. Dec. at 5048-5049) (In determining the amount of fees to be
awarded, it is not legally relevant that plaintiffs' counsel . . . are employed by . . . a
privately funded non-profit public interest law firm. It is in the interest of the public that
such law firms be awarded reasonable attorneys' fees to be computed in the traditional
manner when its counsel perform legal services otherwise entitling them to the award of
attorneys' fees.") (alterations in original).

*v. Secretary of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000) (emphasis added); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).[7]   As discussed above, $200.00 is a reasonable hourly rate for legal work in the Eastern District of Michigan.  Given out-of-town counsel's experience and other credentials, the court is persuaded to award a $200.00 hourly rate for time spent litigating attorney fees in this case.[8]  (Levy Aff. Ex. A.)

Plaintiff contends, quoting *Coulter v. State of Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986), that "in the absence of unusual circumstances, the hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case when the issue is submitted on the papers without a trial. . . ." (Pl's Resp. at 7.)  Here, Defendants' request for hours spent litigating fees amounts to approximately 35% of the hours spent on the main case.  The court agrees with the central lesson in *Coulter*: the fee petition tail should not be allowed to wag the dog.  However, the detail – *Coulter's* 3% solution – is distinguishable.  *Coulter* dealt with fee shifting in a civil rights case in which fees nearly always shift in favor of a prevailing plaintiff.  In a case

---

[7] Local rates are not the maximum reasonable rate where a party is required to hire out-of-town counsel to perform out-of-town legal work.  *Adcock-Ladd*, 227 F.3d at 350-52.  But local rates are appropriate where, as here, counsel "volitionally elect[s] to represent a party in a cause to be litigated within the jurisdiction of a court wherein the case was filed, rather than the judicial venue of the lawyer's professional residence, thus extending notice and an option to the foreign lawyer to reject the commission if he deems unattractive the customary local fee. . . ."  Id. at 351.

[8]The court has periodically awarded a higher hourly rate in some cases.  For purposes of this case, however, the court finds a $200 rate reasonable.  While counsel's credentials could, in other circumstances, merit a higher rate, extraordinary credentials were not required to draft a relatively straightforward motion. Indeed, once the basic premise of a shifted fee is accepted as a given – and it was a strong likelihood in this case in view of *Lucas Nursery* – recovering for the time spent on the fee petition itself is only as difficult as shooting fish in a barrel.  *Weisenberger,* 593 F.2d at 53-54.  Accordingly, a degree of moderation would seem to be in order.

where fees shift as a matter of course, a party generally needs less time to prepare a motion for attorney fees because the issue of whether to grant fees is often trivial, and the real question is quantification.

A prevailing party in a Lanham Act case, in contrast, faces a higher burden to convince a court that fee shifting is appropriate before even reaching the issue of what those fees should be or how many hours the court should attribute to the case. The suggestion of a 3% limit on time spent litigating attorney fees, as set forth in *Coulter*, is therefore not specifically applicable to Lanham Act cases where a prevailing defendant must show that the case is "exceptional" to be awarded fees.

Nonetheless, the court finds that the hours spent on this Motion were excessive and that the fees motion inappropriately predominates. First, the court finds excessive the 5.4 hours Defendants' new counsel spent working on this case between March 11 and March 16, 2010 reviewing briefs and reading depositions – in essence, learning what had happened in the case. (Levy Aff. Ex. C.) Defendants chose to bring in new counsel to litigate attorney fees and thus themselves created the need for new counsel to duplicate work already billed in the main case. The court will eliminate the 5.4 hours of new counsel's work between March 11 and March 16, 2010. The court also finds excessive the 31.1 hours new counsel spent between March 19 and March 25, 2010 writing, researching, and talking to others to produce the Affidavit of Lawrence R. White and Defendants' Memorandum in Support of Defendants' Motion for an Award of Attorney Fees, which amount to only 20 pages of original writing. (*Id.*) New counsel also produced his own 5 page affidavit, but much of that is an off-the-shelf recitation of his resume. (Levy Aff.) The court is thus persuaded to eliminate 11.1 hours for work on

this case between March 19 and March 25, 2010, leaving 20 hours for work during this period and 20 hours in total. This is still 20% of the hours billed to defend the principal case, far more than *Coulter's* 3%

In sum, after this court's adjustments, 20 hours remain at an hourly rate of $200.00 for time spent litigating the issue of attorney fees. The amount of reasonable attorney fees for litigating this Motion is therefore $4000.00. The total amount of reasonable attorney fees and costs for litigating both the main case and attorney fees therefore is $23,102.32.

## VI. CONCLUSION

IT IS ORDERED that Defendants' motion for attorney fees [Dkt # 68] is GRANTED IN PART and DENIED IN PART, as specified further in the body of this opinion.

IT IS FURTHER ORDERED that Defendants are AWARDED costs of $489.82 and attorney fees of $22,612.50 based on 104 billable hours for Defendants' main case counsel at hourly rates ranging from $140.00 to $210.00 and 20 billable hours for Defendants' attorney fees counsel at the hourly rate of $200.00.


S/Robert H. Cleland_____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE
Dated: June 29, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 29, 2010, by electronic and/or ordinary mail.

S/Lisa Wagner_____
Case Manager and Deputy Clerk

(313) 234-5522